UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

AUTOMOBILE INSURANCE COMPANY        **REPORT**
OF HARTFORD CONNECTICUT, a wholly         **and**
owned subsidiary of the St. Paul Travelers     **RECOMMENDATION**
Companies, Inc.,

                    Plaintiff,

      v.                                  **04-CV-770A(F)**

MURRAY, INC.,
THE SCOTTS COMPANY,

                    Defendants.
_____

APPEARANCES:        HODGSON RUSS LLP
                    Attorneys for Plaintiff
                    HUGH M. RUSS, III,
                    STEPHEN W. KELKENBERG, of Counsel
                    One M&T Plaza, Suite 2000
                    Buffalo, New York 14203-2391

                    KENNEY, SHELTON, LIPTAK & NOWAK, LLP
                    Attorneys for Defendants
                    BRIAN ARTHUR MACDONALD, of Counsel
                    Suite 510, Rand Building
                    14 Lafayette Square
                    Buffalo, New York 14203


## JURISDICTION

This case was referred to the undersigned by the Honorable Richard J. Arcara

on October 25, 2004 for all pretrial motions (Doc. No. 5).  The matter is presently before

the court on Defendant Scotts's motion for summary judgment filed January 3, 2007

(Doc. No. 22).

**BACKGROUND**

George and Anne Zaroles ("the Zaroleses") commenced this action on August 4,

2004 in New York State Supreme Court, Erie County, against Defendants Murray, Inc.

("Murray") and The Scotts Company ("Scotts") ("Defendants"), seeking relief for

damage to their home at 495 Highland Avenue in the Town of Tonawanda, New York,

owned by the Zaroleses ("the residence" or "the insured property"),[1] caused by fire on

August 15, 2001, which was ignited by a defective electric-start lawnmower "designed,

manufactured, assembled, licensed, sold, distributed, inspected, serviced, and

repaired" by Defendants (Complaint ¶¶ 10-13).  Specifically, the Zaroleses alleged

common law negligence ("First Cause of Action") ("Count I"), strict products liability for

design defect ("Second Cause of Action") ("Count II"), strict products liability for

manufacturing defect ("Third Cause of Action") ("Count III"), breach of express warranty

("Fourth Cause of Action") ("Count IV"), and breach of implied warranty ("Fifth Cause of

Action") ("Count V") against Defendants.  Complaint ¶¶ 18-43.

On September 22, 2004, Defendants removed the action based on diversity

jurisdiction.  Defendants filed their answer on October 20, 2004 (Doc. No. 4) ("Answer").

On November 9, 2004, Defendants filed a Notice of Bankruptcy (Doc. No. 7)

("Bankruptcy Notice"), advising that Murray had become a debtor in a Chapter 11

proceeding, and that, pursuant to 11 U.S.C. § 362(a)(1), the filing of Murray's

---

[1] Although the parties designate the residence as located within "Buffalo, New York," *e.g.*, Affirmation of Brian A. MacDonald (Doc. No. 22) ¶ 8; Plaintiff's Memorandum In Opposition to Defendant's Motion for Summary Judgment (Doc. No. 25) at 1, based on the zip code for the insured property, 14223, Plaintiff's Exh. G at GAZ 000011, the court takes judicial notice that the insured property is located in the Town of Tonawanda, a northern suburb of the City of Buffalo.  Moreover, the fire investigator's report, Plaintiff's Exh. G at GAZ000012, indicates, correctly, the property was located in the Town of Tonawanda. Plaintiff's Exh. J at GAZ 00004.

bankruptcy petition on November 8, 2004, automatically stayed the instant action

against Murray.[2]  On August 9, 2006, Defendants filed a Notice of Motion to Substitute

Plaintiffs With Real Party In Interest Pursuant to Rule 17(a) of the Federal Rules of Civil

Procedure (Doc. No. 15) ("Motion to Substitute").  On August 22, 2006, Plaintiffs filed a

Declaration in Response to the Scotts Motion for Substitution Under FRCP 17(a) (Doc.

No. 16) ("Response to Defendants' Motion for Substitution").  The court granted the

Motion to Substitute on September 5, 2006, substituting Automobile Insurance

Company of Hartford, Connecticut as the Plaintiff in this action (Doc. No. 17)

("Automobile Insurance" or "Plaintiff") based on Automobile Insurance's status as the

Zaroleses' subrogee.[3]

On January 3, 2007, Scotts filed its motion for summary judgment seeking

dismissal of the complaint against Scotts, pursuant to Fed.R.Civ.P. 56(b) ("Rule 56(b)")

(Doc. No. 22) ("Defendant's motion"), with attached exhibits ("Defendant's Exh(s).

____") and a Memorandum of Law in Support of The Scotts's Motion for Summary

Judgment ("Defendant's Memorandum").  In support of its motion, Scotts also filed, on

January 3, 2007, the Affirmation of Brian A. MacDonald, Esq. (Doc. No. 22 –

Attachment 1) ("MacDonald Affirmation"), and a Statement of Material Facts Pursuant

to Local Rule 56.1 (Doc. No. 22 – Attachment 2) ("Defendant's Fact Statement").

On March 2, 2007, in opposition to Defendant's motion, Plaintiff filed the

---

[2]  By letter dated August 4, 2005, Plaintiff advised the court that the preliminary injunction issued by the Bankruptcy Court for the Middle District of Tennessee, barring Plaintiff from proceeding against Scotts by extending the stay, had been vacated (Doc. No. 36).

[3]  As the Zaroleses' subrogee, Plaintiff has standing to pursue this action.  *See Federal Ins. Co. v. Arthur Andersen & Co*, 552 N.E.2d 870, 872 (N.Y. 1990) (insurer which has paid insured's loss can seek restitution from tortfeasor which caused insured's loss).

Declaration of Stephen W. Kelkenberg, Esq. in Opposition to Defendant's Motion (Doc.

No. 26) ("Kelkenberg Declaration"), a Statement of Disputed Facts (Doc. No. 27)

("Plaintiff's Fact Statement") together with Exhibits A – J ("Plaintiff's Exh(s). ___") and

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion (Doc. No. 25)

("Plaintiff's Memorandum").  On March 5, 2007, Plaintiff filed an Amended

Memorandum of Law in Opposition to Defendant's Motion (Doc No. 29) ("Plaintiff's

Amended Memorandum") and an Amended Statement of Disputed Facts (Doc. No. 30)

("Plaintiff's Amended Fact Statement").  On March 15, 2007, Scotts filed the Reply

Affirmation of Brian A. MacDonald, Esq. (Doc. Nos. 31-1, 2) ("MacDonald Reply

Affirmation") and a Reply Memorandum of Law (Doc. No. 31-3) ("Defendant's Reply

Memorandum").

Because Defendant's motion seeks to dismiss the complaint "in its entirety,"

MacDonald Affirmation ¶¶ 9, 48, but did not specifically address Plaintiff's negligence

and warranty claims, pursuant to a December 17, 2007 pretrial telephone conference

with the parties, Scotts was requested to file a supplemental memorandum of law in

support of Defendant's motion as directed to Plaintiff's Counts I, IV, and V (Doc. No.

32).  Plaintiff was directed to respond by January 11, 2008.  *Id.*  On December 27,

2007, Defendant Scotts filed a Memorandum of Law (Doc. No. 33) ("Defendant's

Supplemental Memorandum").  On January 11, 2008, Plaintiff filed a Supplemental

Memorandum of Law in Opposition to Defendant's Motion (Doc. No. 34) ("Plaintiff's

Supplemental Memorandum").  Oral argument was deemed unnecessary.  Based on

the following, Defendant's motion should be DENIED, in part, and GRANTED, in part.

4

**FACTS**[4]

On August 15, 2001, a fire damaged the Zaroleses' residence which was insured by Automobile Insurance.  Plaintiff's Amended Fact Statement ¶ 1; Defendant's Fact Statement ¶ 1.  Subsequent investigation determined that a defective gasoline-powered, electric-start, push-behind lawnmower was the cause of the fire, a fact undisputed by Scotts.  Plaintiff's Exh. H at 3-4; Exh. I at 5; MacDonald Affirmation ¶ 10, ("This case does not involve any disputed issues of fact material to the determination of this motion.").  The subject lawnmower, designed by Home Depot and Murray, and manufactured by Murray, was sold at retail to the Zaroleses by Home Depot, U.S.A., Inc., a national home and yard retailer and non-party ("Home Depot"), pursuant to an exclusive license agreement with Scotts.  Plaintiff's Amended Fact Statement ¶ ¶ 10-11; Defendant's Fact Statement ¶ ¶ 8, 10.  Investigators determined the fire was ignited by defective wiring in the lawnmower when, after being used to cut grass at the Zaroleses' residence, it burst into "flames coming from the top of the lawnmower" after being placed in the garage attached to the residence.  Kelkenberg Declaration ¶ ¶ 17 (quoting an eye witness, Plaintiff's Exh. B at 12), 22 (citing Plaintiff's Exh. H at 4; Plaintiff's Exh. I at 5); MacDonald Affirmation ¶ 10.  A town fire investigator's opinion attributed the fire to the "hot lawnmower" being place "too close" to combustible material in the garage.  Plaintiff's Exh. J at GAZ 000007.  The Zaroleses purchased the lawnmower on April 24, 2001 from Home Depot.  Plaintiff's Exh. G at GAZ000014.  The record does not reveal the exact date the lawnmower was manufactured.

---

[4] Taken from the pleadings and papers filed in the instant action and in connection with the instant motion.

In 1996, Scotts exclusively licensed Home Depot to sell gas and electric powered lawnmowers manufactured by Murray under the Scotts registered trademark.  Scotts-Home Depot License Agreement, Plaintiff's Exh. C at Scotts 0002-0015, 0035.[5]  On March 1, 2000, OMS Investments, Inc., a wholly owned subsidiary of Scotts ("OMS") and a non-party to this action, licensed Home Depot to use the Scotts trademark on walk-behind, power-push and self-propelled lawnmowers, which Home Depot was to arrange to be manufactured by Murray, and sell the lawnmowers using the Scotts mark.  OMS-Home Depot License Agreement, Defendant's Exh. A at Section 1(A)(i).  Scotts is a federally registered trademark.  *Id.* ¶ 6A, Exh. 1; Plaintiff's Exh. C at Scotts 0018-19.  On October 1, 2000, OMS authorized Murray to manufacture the lawnmowers for exclusive retail sale by Home Depot, under the Scotts registered trademark.  Defendant's Exh. C ("the OMS-Murray Manufacturing Permission Agreement").  Specifications for the design of the lawnmower were formulated by Home Depot, and provided to Scotts for Scotts's approval.  Aronowitz Deposition at 25, 29.[6]  Because Scotts itself lacked "expertise" in such matters, Scotts contracted with an outside consultant to advise Scotts whether the proposed specifications for the lawnmowers were "reasonable," and, if followed by Murray in manufacturing the lawnmower, would produce a "quality" lawnmower suitable for sale using the Scotts mark.  *Id.* at 30-32.  As a result, the lawnmower was designed by Home Depot and Murray.  Defendant's Fact

---

[5]  "Scotts ___" refer to Bates-stamped pages in Plaintiff's Exhibits C, D, E and F.  Plaintiff's Exhibits C and D include copies of monthly written reports filed by Scotts's quality control personnel describing their quality control activities directed to Scotts's third-party producers of Scotts branded products, including Murray.

[6]  Deposition of David M. Aronowitz, Esq., Executive Vice-President and General Counsel of Scotts Miracle-Gro Company, the holding company of Scotts ("Aronowitz Deposition").

Statement ¶ 29 (citing Aronowitz Deposition at 29).

Beginning in 1996 and, as later provided in the OMS-Murray Manufacturing Permission Agreement, Defendant's Exh. C at 6, Section 8B, after 2000, Scotts's quality control personnel visited Murray's manufacturing facility in Tennessee to conduct quality control inspections and audits to assure that Murray's manufacturing of the Scotts brand lawnmowers complied with the specifications, as approved by Scotts, including occasional sample testing by Scotts's personnel of the lawnmowers for compliance with the approved specifications.[7]  Plaintiff's Exh. C at Scotts 0136-37, 0149; Aronowitz Deposition at 32-34, 46, 48.  The purpose of Scotts's quality control actions in relation to Murray's production of the lawnmowers was to assure Scotts that Murray adhered to manufacturing processes "making it likely that the [lawnmower] product is going to meet the specifications."  Aronowitz Deposition at 25, 27-28.  During 1999 and 2000, Scotts conducted over 100 such quality audits at the Murray manufacturing facility directed to Murray's production of the Scotts brand lawnmowers. Plaintiff's Exh. C at Scotts 0097; Plaintiff's Exh. D at Scotts 0151, 0158, 0166 and 0168. As of June 2000, Scotts determined that its own quality assurance "protocol"[8] was needed to "aid Murray with quality conformity."  Plaintiff's Exh. C at Scotts 0156.  In July 2000, Scotts noted deficiencies in quality control for "raw materials" and other supplies

---

[7]  The OMS-Murray Manufacturing Permission Agreement, Section 8B, provided that either OMS or "a third party" was authorized to conduct the inspections of Murray's "quality documents," audits and samples.  Defendant's Exh. C at 6.  There is no dispute that this inspection function was conducted solely by Scotts's, not OMS's, employees.

[8]  The protocol is not provided in the record.  However, as relevant, the definition of the term "protocol" includes a memorandum of understanding or agreement, a "plan," or "procedure."  Webster's Third New International Dictionary (1986) at 1824.

7

used by Murray to manufacture the walk-behind Scotts brand lawnmowers, and that "a formal Scotts protocol" would be "developed to address the deficiencies."  Plaintiff's Exh. D at Scotts 0170.  Scotts's quality-control personnel had a "role" in "solving . . . problems" in Murray's manufacture of the Scotts brand lawnmowers.  Aronowitz Deposition at 25.  Under the OMS-Murray Manufacturing Permission Agreement, Scotts had the power to terminate Murray's authority to manufacture the lawnmowers using the Scotts trademark in the event of non-compliance by Murray with Scotts's approved specification and quality assurance reporting requirements.  Aronowitz Deposition at 34, 48, 56, 73, 78-79.[9]  The OMS-Murray Manufacturing Permission Agreement required, in Section 8A, Murray to produce lawnmowers of "high quality" that met or exceeded national safety standards and that were "free of manufacturing and design defects" capable of causing lawsuits based on, *inter alia*, negligence, strict liability or warranty. Defendant's Exh. C at 5-6.

In conducting such quality oversight, Scotts's personnel reviewed all documentation relating to all aspects of production for the Scotts brand lawnmowers manufactured by Murray.  Aronowitz Deposition at 77.  Scotts's review of such documentation included reports required to be filed by Murray with the United States Consumer Protection Commission regarding safety testing, service calls, quality assurances, and engineering changes relating to the Scotts brand lawnmower

---

[9] After initially testifying that Scotts had such authority, Mr. Aronowitz stated that OMS had such authority.  Aronowitz Deposition at 79.  Regardless of Mr. Aronowitz's apparent inconsistency or ambivalence on this point, the OMS-Murray Manufacturing Permission Agreement granted such termination authority to both OMS and Scotts.  *Compare* Plaintiff's Exh. C ¶ 12 (OMS had authority to terminate the agreement based on Murray's non-compliance) with Plaintiff's Exh. C ¶ 14 (allowing Murray to transfer to Home Depot lawnmowers "on hand" after termination "by Scotts or on expiration [of the agreement].") (underlining and bracketed material added).

manufactured by Murray.  *Id.* at 75-76.  As a result of Scotts's quality assurance reviews in October 2000, a plan for "new" quality assurance protocols for Scotts's power equipment products, including the lawnmower at issue, was developed by Scotts's quality assurance staff, Plaintiff's Exh. C at Scotts 0111, 0116, and was to be reviewed with Murray by Scotts's quality control personnel in anticipation of Murray's start-up manufacturing of the electric-start lawnmower, a new model of the Scotts brand lawnmower, under the new protocols in January 2001.  *Id.*  Murray commenced production of the Scotts brand electric-start lawnmower in early 2001 under quality control standards that had been reviewed by Scotts's quality assurance personnel. Aronowitz Deposition at 116-17, 119 (referencing Plaintiff's Exh. C at Scotts 0125-26); Plaintiff's Exh. C at Scotts 0121.  In contrast to Scotts's use of an outside expert to advise on the adequacy of the specifications for the lawnmower to be manufactured by Murray in 1996, nothing in the record shows a similar review of the design for the new electric-start model, which Murray commenced producing in early 2001.

Under the OMS-Murray Manufacturing Permission Agreement, Scotts, not OMS, maintained a toll-free telephone number for customer complaints about the lawnmower. Aronowitz Deposition at 71.  The agreement required Murray to respond to customer complaints regarding issues of "quality and characteristics" of the lawnmower, and to provide OMS with a report describing the complaints and Murray's responses.  OMS-Murray Manufacturing Permission Agreement Section 8B, Defendant's Exh. C at 6. One of Scotts's quality control assurance senior specialists was assigned to monitor Murray's production of the Scotts brand electric-start lawnmowers for quality control purposes, including start-up manufacturing.  Aronowitz Deposition at 85, 119-20.

9

Another Scotts quality control official was present at the commencement of production for the lawnmowers at Murray's facility. *Id.* at 89; Plaintiff's Exh. C at Scotts 0137. Introduction of the new Scotts brand electric-start lawnmower in January 2001 was reviewed by the Scotts quality control specialist, Melvin Smith, who was assigned, in October 1998, to oversee Murray's adherence to Scotts's quality control standards. Plaintiff's Exh. C at Scotts 0121 (noting numerous customer complaints that were "engine related."), Scotts 0126 ("Murray startup production will be monitored by Melvin Smith week of 1/14 [*sic*].  This will also include the electric-start unit reviews.") (Scotts Quality Control Reports dated January 7, 2001, and February 6, 2001, respectively), Scotts 0137 ("Melvin Smith and Dick Kent audited Murray startup production.").

Pursuant to the OMS-Murray Manufacturing Permission Agreement, Scotts encouraged Murray to adopt a quality control format similar to one used by the John Deere Company, another third-party manufacturer of Scotts brand lawn and garden products, in producing other Scotts brand products including tractor-type lawnmowers. Aronowitz Deposition at 103.  The safety, preparation, operation and maintenance brochure for the Scotts Model 226870X8A, the type of lawnmower at issue in this case, Plaintiff's Exh. F, used only Scotts's name, not Murray's, and does not identify Murray, by name, as the manufacturer of the lawnmower, other than stating the address of Murray's Brentwood, Tennessee manufacturing facility.  Aronowitz Deposition at 137-39.  As early as 1998, Scotts was aware of starting, ignition, and product dependability problems with the Scotts brand lawnmowers manufactured by Murray for sale by Home Depot.  *Id.* at 124-26; Plaintiff's Exh. C at Scotts 0052, 0139-40.  The limited warranty contained in the operator's manual for the Model 226870X8A Scotts brand lawnmower

10

was issued by Scotts in its name, not Murray's, Plaintiff's Exh. F, and provided a Scotts toll-free telephone number for customer inquiries regarding operation and service. Plaintiff's Exh. D at Scotts 0228-29, 0260.

In the OMS-Murray Manufacturing Permission Agreement, Section 7 A and 7 B, Murray agreed to defend and indemnify both OMS and Scotts, as OMS's sole shareholder, and maintain insurance, including self-insurance provided Murray maintained adequate net worth, against any legal "claim arising from or related to" the Scotts brand lawnmowers manufactured by Murray.  Defendant's Exh. C at 3-5; Aronowitz Deposition at 68-69.  Murray maintained such insurance which directly benefitted Scotts, along with OMS, as a co-insured.  Aronowitz Deposition at 68-69.

The OMS-Home Depot License Agreement, under which the lawnmower was sold to the Zaroleses, provided similar protection to Scotts by Home Depot.  Aronowitz Deposition at 44-46; Defendant's Exh. A, Section 7A, at 7. Scotts was involved in the preparation of Home Depot's quality control manual used in connection with its sales of the Scotts brand lawnmowers.  Aronowitz Deposition at 104; Plaintiff's Exh. C at Scotts 0040-0041.  Scotts conducted, pursuant to the 1996 Scotts-Home Depot License Agreement, Section 7B, Plaintiff's Exh. C at 7, and the OMS-Home Depot License Agreement, Section 8B, Defendant's Exh. A at 9, numerous inspections directed at assuring the quality of the lawnmowers sold by Home Depot.  Plaintiff's Exh. B at Scotts 0083, Scotts 0112.  Under the 1996 Scotts-Home Depot License Agreement and the 2000 OMS-Home Depot License Agreement, Scotts and OMS were granted authority to approve all "advertising, promotional . . . or display material" for all lawnmowers with the Scotts trademark.  Plaintiff's Exh. C at 7; Defendant's Exh. A at 9-10.  Scotts was paid a

minimum royalty of $2 million by Home Depot on annual sales of the Murray

manufactured lawnmowers and a greater royalty if Home Depot's annual sales of

lawnmowers exceeded $100 million.  Plaintiff's Exh. C at Scotts 0140; OMS was to

receive the same royalties under its license agreement with Home Depot.  Defendant's

Exh. A at 3.  Scotts's license to Murray was granted on a royalty-free basis.  OMS-

Murray Manufacturing Permission Agreement, Section 2A, Defendant's Exh. C at 2.

　　　　In its answer, Scotts admitted it had "licensed" the lawnmower produced by

Murray, Complaint ¶ 10; Answer ¶ 10.  However, Scotts denied Plaintiff's allegation that

it had expressly warranted the lawnmower was safe for the use and purpose intended,

Complaint ¶ 35; but admitted it had impliedly warranted the lawnmower was "safe" for

ordinary use.  Complaint ¶ 40; Answer ¶ 40.  In support of the instant motion,

Defendant's Memorandum at 3, Scotts contended it was not a party to the OMS-Murray

Manufacturing Permission Agreement and that OMS was the "only entity that could

license . . . [the Scotts trademark]." *Id.* (bracketed material added).  In reply to Plaintiff's

opposition to the instant motion, Scotts stated it had made a "clear showing" that Scotts

was "a mere licensor of the Scotts trademark with respect to the subject lawnmowers,"

MacDonald Reply Affirmation ¶ 3, and that Scotts's "role surrounding the subject

lawnmower [was] limited to that of a mere trademark licensor."  *Id.* ¶ 5 (bracketed

material added).  Scotts also acknowledged it "shares with OMS an interest in the

'Scotts' trademark and trade dress."  MacDonald Affirmation ¶ 8 n. 1.  Plaintiff did not

dispute that Home Depot was the "exclusive retailer of the subject lawnmower."

Plaintiff's Amended Fact Statement ¶ 11.

12

**DISCUSSION**

Summary judgment will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), *cert. denied,* 484 U.S. 1066 (1988); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact.  If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Catrett, supra*, at 322.  Nevertheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson, supra*, at 247-48.  Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

Scotts seeks summary judgment dismissing the action on the basis that Plaintiff's claims all fail as a matter of law.[10]  MacDonald Affirmation ¶ 8.  Specifically,

---

[10]  Because Defendant's motion sought dismissal of all Plaintiff's claims, MacDonald Affirmation ¶ 48; Defendant's Memorandum at 18, but did not specifically challenge Plaintiff's negligence (Count I) and warranty claims (Counts IV and V), the court directed the parties file supplemental legal memoranda addressing these claims.  Background, *supra*, at 4 (citing Doc. No. 32).  In its supplemental memorandum,

Scotts contends that because at the time the lawnmower was manufactured in 2001,

OMS, not Scotts, was the actual owner and licensor of the Scotts trademark to Home

Depot and Murray for lawnmowers, including the lawnmower at issue in this case,

manufactured by Murray under the Scotts trademark pursuant to the OMS-Murray

Manufacturing Permission Agreement, Plaintiff has sued the wrong party.  MacDonald

Affirmation ¶ 8; Defendant's Memorandum at 2.  Scotts's primary support for this

contention is the OMS-Murray Manufacturing Permission Agreement, Defendant's Exh.

C, under which OMS, as the owner of the Scotts trademark, purported to grant Murray

"permission" to place the Scotts trademark on the lawnmowers and which represented

that OMS is the owner of the Scotts trademark.  Defendant's Exh. C at 1, 6.  Scotts

further argued that even if Plaintiff had sued OMS, Plaintiff's claims would still fail under

New York law which, Scotts contends, precludes strict products liability claims against

trademark licensors where the relationship of the trademark licensor to the defective

product is based on the fact that the licensor had only licensed production by an

unrelated manufacturer using its trademark.[11]  MacDonald's Affirmation ¶ 8;

---

Plaintiff objected to the court's consideration of such issues, relying upon New York caselaw.  Plaintiff's Supplemental Memorandum at 2-4.  However, upon removal, the district court's review of the issues of law raised on pretrial motions, except as to matters of substantive law in a diversity case, is subject to federal, not state law, specifically the Federal Rules of Civil Procedure.  Fed.R.Civ.P. 81(c).  Moreover, the court is permitted to consider any issue bearing on the merits of a request for summary judgment regardless of whether raised by the parties.  *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000).  ("[T]he trial court has discretion to conduct an assiduous review of the record in an attempt to weigh the propriety of granting a summary judgment motion . . ..").  Accordingly, as Plaintiff's objection goes to a procedural issue controlled by the Federal Rules of Civil Procedure, it is without merit.  While Plaintiff is correct that Scotts does not specifically support its request for dismissal of Plaintiff's negligence claim, in the interest of completeness, the court will, notwithstanding Defendant's oversight, address Plaintiff's negligence and warranty claims.

[11] As this is a diversity case, in the absence of any suggestion by either party to the contrary, the court applies New York substantive law as required by *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941).

Defendant's Memorandum at 2-3 ("OMS . . . is a mere licensor of a [Scotts] trademark . . ..") (bracketed material added).  Thus, Scotts, in bringing the instant motion, initially maintained that even if it had licensed the use of its trademark for the lawnmowers produced by Murray, it could not, under Plaintiff's allegations and on this record, be held liable under New York strict products liability or warranty law.  *Id.*; MacDonald Affirmation ¶ 47 ("To the extent that Scotts acted as a trademark licensor, the same arguments apply.").  Scotts does not dispute that the OMS-Murray Manufacturing Permission Agreement granted to Murray a license to use the Scotts trademark. Defendant's Memorandum at 3.  As noted, Scotts failed to address specifically Plaintiff's negligence and breach of warranty claims.

In opposition, Plaintiff contends Scotts, in its answer, conceded it is the trademark licensor of the lawnmower at issue, both as to its manufacture by Murray and retail sale by Home Depot, and that because Scotts was involved directly in creating the lawnmower's specifications and the extensive quality control activity related to Murray's production of the lawnmower, Scotts, as a trademark licensor, may be held liable to Plaintiff on Plaintiff's strict products liability, negligence and warranty claims.  Plaintiff's Amended Memorandum at 3, 5 (citing *O'Bara v. Piekos*, 555 N.Y.S.2d 939, 940 (4th Dep't 1990) ("well settled that actions against immediate and remote parties" for injuries caused by a "defective or dangerous product" may be "based on . . . warranty, negligence of strict products liability."); Plaintiff's Supplemental Memorandum at 3, 5, 6 (reiterating Plaintiff has sued on negligence, strict products liability and breach of warranty (citing authorities).  Plaintiff also argues that as Scotts admitted it impliedly warranted the lawnmower was safe for its intended use, it is not entitled to summary

15

judgment on Plaintiff's implied warranty claim, Plaintiff's Fifth Cause of Action,

regardless of its status as a trademark licensor.  Plaintiff's Supplemental Memorandum

at 4-6 (citing Scotts's answer ¶ 40).

Additionally, Scotts asserts that, under its 1996 license agreement with Home

Depot and the 2000 OMS-Home Depot License Agreement, Home Depot, not Scotts,

was the exclusive seller of the lawnmower at issue, and that as both license

agreements were intended to protect the value of the Scotts trademark, Scotts's action

to assure the quality of the lawnmowers based on its status as a trademark licensor are

insufficient, under New York law, to hold Scotts liable as a seller of the lawnmowers

under Plaintiff's strict products liability and warranty claims.  MacDonald Affirmation ¶ ¶

42-44.  As noted, Facts, *supra*, at 12, under both licensing agreements, Scotts was

guaranteed the greater of a minimum annual royalty of $2 million or a percentage of

Home Depot's net sales of the lawnmowers over $100 million.  Plaintiff's Exh. A at 2

(1996 Scotts-Home Depot License Agreement); Defendant's Exh. A at 3 (OMS[12]-Home

Depot License Agreement).  Plaintiff therefore maintains that based on the contractually

created quality controls available to Scotts directly under the 1996 agreement and as "a

third-party" acting on behalf of OMS under the 2000 agreement, Defendant's Exh. A

Section 8 B at 9, over Home Depot's sales of the Scotts brand lawnmowers as well as

its right to indemnification by Home Depot against strict products liability claims,

including those based on strict products liability, negligence, and breach of warranty

claims arising from such sales, Scotts trademark licensor status does not bar, as a

---

[12]  It is undisputed that OMS is Scotts's wholly-owned subsidiary.

matter of New York law, potential liability on any of Plaintiff's claims.  Plaintiff's Amended Memorandum at 9-12.

Plaintiff also contends Scotts is the "only apparent manufacturer of the subject lawnmower."  Kelkenberg Declaration ¶ ¶ 51-53.  Specifically, Plaintiff points to several customer complaints regarding the lawnmowers demonstrating such purchasers believed they had a bought a lawnmower manufactured by Scotts.  *Id.* ¶ 52 (citing Plaintiff's Exh. D at Scotts 0184, 0190, 0191, 0192, 0205) (copies of e-mails and correspondence documenting customer complaints).  In response to Plaintiff's opposition to Defendant's summary judgment request, Scotts asserted Scotts's status was "limited to that of a mere trademark licensor." MacDonald Reply Affirmation ¶ 3; Defendant's Reply Memorandum at 4.

A.   Plaintiff's Strict Products Liability Claims.[13]

Established New York law holds manufacturers liable under strict products liability for defective products based on a "manufacturing flaw, improper design or failure to warn."  *Sukljian v. Charles Ross & Son Co., Inc.*, 503 N.E.2d 1358, 1360 (N.Y. 1986) (citing New York cases).  Specifically, under strict products liability, a manufacturer which places a defective product on the market is liable for injury resulting from using the product for its intended or reasonably foreseeable purposes.  *Denny v. Ford Motor Company,* 662 N.E.2d 730, 736 (N.Y. 1995) (affirming distinction, under New York law, between claims based on strict products liability and breach of implied

---

[13] Plaintiff's Second and Third causes of action allege strict products liability against Scotts and Murray based on design and manufacturing defects, respectively, and the court's discussion is therefore directed to both causes of action.  Because the parties primarily present opposing arguments directed to these claims, the court considers Plaintiff's strict liability claims first; consideration of Plaintiff's negligence claim follows.  *See* Discussion, *infra*, at 51-60.

17

warranty of fitness pursuant to N.Y. U.C.C. § 2-314[2][c], including being "minimally safe" for the product's "expected purpose").  Strict products liability based on a defective design allegation may be imposed where, upon consideration of the product's potential for causing injury and the availability of alternative designs, a jury concludes that it was unreasonable to market the product in its present condition based on the design used by the manufacturer to produce the defective product.  *Denny*, 662 N.E.2d at 732.  A finding of such liability requires the jury to balance the risks of using the product in its present condition against the product's risks and costs, and against the risks, usefulness and costs of using the alternative design instead of the one creating the alleged defect.  *Id.*  Although liability for injury caused by defectively designed or manufactured products may also be pleaded under common law negligence, *Sukljian,* 503 N.E.2d at 1362 (citing cases), strict products liability based on defective design or failure to warn are closely related to common-law negligence principles of fault based on the unreasonable conduct of the manufacturer.  *Denny*, 662 N.E.2d 735.  However, where the product fails to function as intended based on an undetected manufacturing flaw, liability without fault is established.  *Id.* at 736 n. 3.  *See Gebo v. Black Clawson Company*, 703 N.E.2d 1234, 1237 (N.Y. 1998) (recognizing possible liability based on strict products liability for a manufacturing "flaw" and "improper" design, or failure to provide adequate warnings).

In addition to a manufacturer, New York law extends potential strict products liability for defectively manufactured or designed products to "any one responsible for placing the defective product in the marketplace," including "distributors, retailers,

processors of materials and makers of component parts." *Brumbaugh v. CEJJ, Inc.,* 547 N.Y.S.2d 699, 702 (2d Dep't 1989) (holding exclusive marketer strictly liable based on sale of defective product as "mandatory link" in the distribution of defective product) (citing New York caselaw).  Under New York law, strict products liability "should be imposed only where the defendant actively ushers a [defective] product into the market." *Id.* (bracketed material added).  New York's expanded imposition of strict products liability arises from policy considerations including the ability of sellers, and others in the product's distribution chain, to insist that their manufacturers produce safe products, and to obtain indemnification from such manufacturers in the event of adverse legal claims based on injuries from defective products.  *Sukljian*, 503 N.E.2d at 1360; *Brumbaugh*, 547 N.Y.S.2d at 701; *Mead v. Warner Pruyn Div., Finch Pruyn Sales, Inc.,* 394 N.Y.S.2d 483, 483 (3d Dep't 1977) (noting that imposition of strict products liability on retailer of defective product "'will bring from the retailer further pressure on the manufacturer for safety in design and production', [*sic*] all to the protection of the public.'") (quoting *Mead v. Warner Pruyn Div., Finch Pruyn Sales, Inc.*, 386 N.Y.S.2d 342, 344 (S.Ct. Wash. Cty 1976) and citing *Codling v. Paglia*, 298 N.E.2d 622, 628 (N.Y. 1973)).[14]

---

[14]  Although Plaintiff asserted in opposition to Defendant's motion, that the record demonstrates Scotts was the "apparent manufacturer" of the lawnmower, Kelkenberg Declaration at 51, Plaintiff has not alleged a cause of action under Restatement (Third) of Torts: Product Liability § 14 (formally § 400), providing for liability to sellers of trademarked products manufactured by a third party if the product is sold as the seller's own product.  This basis of liability, under New York law, is limited to sellers.  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1462-463 (2d Cir. 1995) (citing New York cases). *See also* Restatement (Third) of Torts § 14 cmt. d (apparent manufacturer liability inapplicable to trademark licensor which authorized use of trademark on product if licensor is not seller).  Here, despite Plaintiff's assertion that Scotts was the "only apparent manufacturer of the subject lawnmower," Kelkenberg Declaration at 51, Plaintiff conceded that Home Depot was the "exclusive retailer" of the lawnmower.  Plaintiff's Amended Fact Statement ¶ 11 (underlining added).  Accordingly, because Plaintiff concedes Home Depot was the seller of the lawnmower, the court does not consider Plaintiff to allege the apparent manufacturer theory of strict

Nevertheless, New York courts also hold that a party "whose role in placing defective product in the stream of commerce is so peripheral to the manufacture and marketing of the product that it would not further these policy considerations" is not liable. *Brumbaugh,* 547 N.Y.S.2d at 701 (citing *Sukljian, supra*).  Accordingly, a trademark licensor is not "liable for injuries caused by the defective product" which carries the licensor's trademark based on strict products liability, unless the licensor is shown to have had "<u>significant</u> <u>involvement</u> in [the] distribution <u>or is</u> <u>capable</u> <u>of</u> <u>exercising</u> <u>control</u> <u>over</u> [the] <u>quality</u> [of the product]." *Harrison v. ITT Corporation*, 603 N.Y.S.2d 826, 826 (1ˢᵗ Dep't 1993) (citing cases) (upholding summary judgment where plaintiff failed to adduce any evidence of such involvement or capability by trademark licensor and absent evidence licensor failed to observe corporate form in regard to operations of its manufacturing subsidiary) (bracketed material and underlining added); *see also Porter v. LSB Industries, Inc.*, 600 N.Y.S.2d 867, 871 (4ᵗʰ Dep't 1993) (upholding summary judgment dismissing strict products liability claims against trademark licensor absent proof that licensor "<u>actually</u> designed, manufactured, sold, distributed, or marketed" defective product or evidence that manufacturing subsidiary was so dominated by licensor parent as to impute liability of subsidiary to parent) (underlining added).  Where strict products liability is to be predicated on the trademark

---

products liability against Scotts.  Rather, the court finds that Plaintiff relies on the contention that Scotts is liable to Plaintiff under strict products liability based on Scotts's involvement in the lawnmowers chain of distribution arising from Scotts's direct involvement in the design, manufacture and sale of the lawnmowers by Murray and Home Depot, respectively.  *See* Restatement (Third), *supra*, cmt. d. ("Trademark licensors are liable for harm caused by defective products distributed under the licensor's trademark or logo when they participate substantially in the design, manufacture, or distribution of the licensor's products.  In these circumstances, <u>they</u> <u>are</u> <u>treated</u> <u>as</u> <u>sellers</u> of the products bearing their trademarks.") (underlining added).

licensor's capacity to oversee the quality controls applicable to the licensee's manufacturing of the trademarked product, such capacity must be established by evidence other than the license itself.  "Although the actual exercise of control is not required by *Harrison,* the requisite 'capacity' of exercising control must exceed the mere existence of a licensing arrangement, whether it be pursuant to special terms in the licensing agreement or a more extensive relationship between the parties."  *In re: Celotex Corporation*, 487 F.3d 1320, 1338 (11th Cir. 2007) (quoting *Harrison,* 603 N.Y.S.2d at 826 (citing *Torres v. Goodyear Tire and Rubber Co.*, 786 P.2d 939, 944-45 (1990))).

Thus, under New York law, in a strict products liability case where there is no evidence of a trademark licensor's "actual control" over the production, including the capacity to exercise control over product quality, or the distribution, including sales, of a defective product, summary judgment is available to the licensor.  *D'Onofrio v. Boehlert*, 635 N.Y.S.2d 384, 385 (4th Dep't 1995) (summary judgment properly granted where no evidence demonstrated trademark licensor had "actual control" over product's design, manufacture or marketing plan); *see also Bova v. Caterpillar, Inc.*, 761 N.Y.S.2d 85, 87 (2d Dep't 2003) (placing famous trademark on defective product in itself insufficient basis for strict products liability against owner of mark); *Harrison*, 603 N.Y.S.2d at 826 (affirming summary judgment in favor of trademark licensor absent evidence of licensor's "significant involvement" in manufacturing of product or as being capable of "exercising control over [the] quality [of the product].");  *Kane v. A.J. Cohen Distributors of General Merchandise, Inc.*, 569 N.Y.S.2d 108, 109 (2d Dep't 1991) (tradename

owner not liable for strict products liability claim where its control over sales premises was limited to inspection of premises and removal of merchandise deemed "detrimental to its reputation."); *Balsan v. Delma Engineering Corporation,* 532 N.Y.S.2d 105, 108-109 (1st Dep't 1988) (display of famous "signs and logos" by national oil company at filling station insufficient to indicate trademark owner had a duty of care as a predicate for premises liability).  New York's exclusion of trademark licensors from the ambit of strict products liability absent evidence of actual and significant involvement in the design, manufacture, sale, distribution, or marketing of a defective product licensed by a trademark registrant stems from the view that trademark ownership or registration "may indicate nothing more than the fact that the registrant had a marketing idea or concept  . . . [and that] it is common for a registrant [of the trademark] not to use a trademark itself, but to license it for use by another entity."  *Porter*, 600 N.Y.S.2d at 871 (bracketed material added) (Denman, P.J.).

In the instant case, Scotts initially maintained, in support of its request for summary judgment, that OMS, and not Scotts, was the sole licensor of the Scotts trademark under which Murray manufactured, and Home Depot exclusively sold, the Scotts brand "electric start" lawnmower at issue.  Defendant's Memorandum at 11.  Scotts also contended that OMS's relationship to Murray was limited to "'policing the use of the Scotts marks,'" Defendant's Memorandum at 9 (quoting Aronowitz Deposition at 60), and "protecting the integrity of [the Scotts trademark]."  *Id.* at 12 (bracketed material added).  However, in response to the filing of Plaintiff's opposition to Defendant's motion, Scotts withdrew that contention acknowledging, instead, that Scotts's role with regard to Murray's production of the subject lawnmower was "limited

22

to that of a <u>mere</u> <u>trademark</u> <u>licensor</u>."  MacDonald Reply Affirmation ¶ ¶ 3, 5

(underlining added).  Additionally, whereas Scotts had contended in support of its

motion for summary judgment that OMS, and not Scotts, was the licensor of the Scotts

trademark for the lawnmower, which is the subject of the instant litigation, Defendants'

Memorandum at 11 ("OMS was a Trademark Licensor Only"), in its Reply Memorandum

of Law, filed March 15, 2007 (Doc. No. 31-3), responding to Plaintiff's opposition to

Defendant's motion, Scotts admitted that "Scotts' [*sic*] role was limited to <u>that</u> <u>of</u>

<u>trademark</u> <u>licensor</u>," and that Scotts's involvement with the production of the

lawnmower was based on an exercise of <u>its</u> "<u>contractual</u> <u>rights</u> . . . to oversee the value

and integrity of its trade dress."  Defendants' Reply Memorandum at 4-5 (underlining

added).  Accordingly, because in responding to Plaintiff's opposition to Scotts's request

for summary judgment, in which Plaintiff pointed out that Scotts had conceded in its

answer, Answer ¶ 10, that Scotts had licensed production of the lawnmower, *see Gibbs*

*v. Cigna Corporation,* 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer,

as in any pleading, are judicial admissions that bind the defendant throughout . . . this

litigation.) (citing cases), Scotts agreed that Scotts was the trademark licensor of the

Murray manufactured lawnmower, the court finds that Scotts has abandoned its

position, in support of summary judgment, that OMS, and not Scotts, was the sole

licensor of the Scotts trademark used to manufacture the lawnmower at issue.  *See*

*Ludwiczak v. Hitachi Capital America Corp.*, 528 F.Supp.2d 48, 59 (D.Conn. 2007)

(failure of party to rebut position taken by adversary on summary judgment constitutes

abandonment of party's claim).  The court's analysis of the merits of Defendant's

motion therefore proceeds on the basis that Scotts, not OMS, was the licensor of the Scotts trademark for the lawnmower at issue.

Alternatively, even if Scotts's initial position in support of its request for summary judgment that OMS, and not Scotts, was the actual trademark licensor of the lawnmower was not abandoned, and thus not conceded by Scotts, although the licensing agreement between OMS and Home Depot and manufacturing permission agreements between OMS and Murray, Defendant's Exhs. A and C, respectively, represent OMS as the sole owner and licensor of the Scotts trademark, several factors reasonably support an inference, requiring trial, that Scotts was the actual licensor. Such factors include that (1) OMS is a wholly-owned subsidiary of Scotts with no other business purpose apparent from the record except to hold and license the Scotts mark, (2) the OMS-Murray Manufacturing Permission Agreement grants authority to OMS, or "a third-party," to exercise quality control with respect to Murray's manufacturing of the Scotts branded lawnmowers produced by Murray, Defendant's Exh. C Section 8B at 9, (3) as such "third-party" Scotts was authorized to inspect Murray's manufacturing plant, "quality documents [*sic*]," and to "conduct quality audits [*sic*] . . . and obtain random samples" of the lawnmowers produced by Murray, *id;* (4) the record is replete with other evidence that Scotts's quality control personnel actively exercised such quality control authority by regularly visiting Murray's manufacturing facilities and reviewing Murray's quality control processes and records to assure Murray's compliance with Scotts's quality control requirements and recommendations with the intent to police and protect the Scotts trademark, Facts, *supra*, 7-8, 9-10, (5) that design specifications for the lawnmower were submitted by Home Depot and Murray to Scotts for Scotts's approval,

24

and (6) no evidence indicates that OMS, as an entity, acted to police enforcement of the OMS-Murray Manufacturing Permission Agreement.  Coupled with Scotts's concession that it, and not OMS, "licensed" the lawnmower produced by Murray, Answer ¶ 10, as well as Scotts's subsequent admission by its attorneys in filed pleadings[15] that it was the "licensor," albeit "a mere licensor," of its trademark to Murray, MacDonald Reply Affirmation ¶ ¶ 3, 5; Defendant's Reply Memorandum at 4, a reasonable juror could find that Scotts, not OMS, was the *de facto* or actual licensor of the Scotts trademark applied by Murray to the lawnmower manufactured by Murray and sold by Home Depot to the Zaroleses.[16]  In reaching this conclusion, a reasonable juror could also rely on the undisputed fact that the limited three-year express consumer warranty covering the lawnmower, including the 90-day warranty on the motor and electronic ignition system extended by Tecumseh, the manufacturer of the motor, was issued by Scotts, Plaintiff's Exh. F at Scotts 0229, and not OMS or Murray, to support a finding that Scotts was the actual licensor of its trademarked product.  Further, as the record does not indicate the precise date the lawnmower was manufactured, if the jury finds the date of any manufacture preceded October 2000, the effective date of the OMS-Murray Manufacturing Permission Agreement, then the lawnmower was licensed by Scotts, as the OMS-Murray 2000 agreement could not have been the source of the trademark on a lawnmower manufactured before such date.  However, as Murray's

_____

[15] Such admissions constitute admissible evidence.  *See* Fed.R.Evid. 801(d)(2)(D) (statement of party's agent . . . concerning a matter within the scope of the agency . . . made during existence of "the relationship" admissible as an exception to the Hearsay Rule).

[16] In support of its request for summary judgment on the ground that under New York law it cannot be held liable in strict products liability, Scotts also admitted that it "shares with OMS an interest in the 'Scotts' trademark and trade dress."  MacDonald Affirmation ¶ 8 n. 1 (underlining added).

25

production of the electric-start lawnmower commenced in January 2001, and the

Zaroleses purchased the lawnmower in April 2001, it is highly likely the lawnmower was

produced pursuant to the 2000 OMS-Murray agreement.

An additional ground for finding Scotts to be the actual licensor may be founded

on Scotts's corporate relationship to OMS and as apparent under the OMS-Murray

Manufacturing Permission Agreement.  As discussed, Discussion, *supra,* at 20-21,

relevant New York caselaw permits evidence of corporate domination of a

manufacturing subsidiary by a parent trademark licensor of the product as a predicate

for imposing liability upon the parent-licensor in a strict products liability case against a

corporate parent-licensor based on a design or manufacturing defect.  *See Harrison,*

603 N.Y.S.2d at 826 (noting plaintiff's failure to raise issue of fact establishing

defendant-licensor's failure to observe corporate formalities of "separate corporate

existence" between itself, as parent, and its wholly-owned manufacturing subsidiary);

*Porter,* 600 N.Y.S.2d at 870-71 (finding insufficient evidence of overlap of officers and

directors or other indicia of control beyond mere ownership to warrant imposing liability

on trademark licensor-parent based on status of wholly-owned subsidiary as exclusive

distributor of defective product).  Here, even if the Chief District Judge should find that

Scotts has not conceded it is the licensor of the Scotts brand lawnmower, Plaintiff's

allegations, charging Scotts as the licensor of the trademark lawnmower, are broad

enough, subject to proof at trial, to include imposition of liability against Scotts based on

the corporate *alter ego* doctrine, such that OMS's status as Scotts's wholly-owned

subsidiary may be disregarded by the jury in determining which entity was, in fact,

responsible for the licensing of the Scotts trademark to Murray and thus exposed, based on that status, to Plaintiff's strict products liability and breach of warranty claims. *See Harrison, supra; Porter, supra*.

In particular, evidence of Scotts's domination of OMS with respect to licensing of its trademark to Murray may be found in Mr. Aronowitz's deposition. In testifying on behalf of Scotts, Aronowitz Deposition at 7-8 (acknowledging that he was being deposed "to answer questions on behalf of the Scotts Company"), in responding to questions regarding the operation and effect of the OMS-Murray Manufacturing Permission arrangement, Mr. Aronowitz referred to Scotts, and not OMS. *E.g.*, Aronowitz Deposition at 14-15 (2000 OMS-Home Depot License Agreement prepared by Scotts's attorneys); *id.* at 16, 27, 31, 56, 65 and 69 (referring, repeatedly, to Scotts and OMS as "we" in response to Plaintiff's questions regarding trademark licensing and quality control of Murray's manufacturing processes for Scotts branded products pursuant to the OMS-Murray Manufacturing Permission Agreement). Moreover, in November 1999, Scotts's legal department proposed to Home Depot an extension of the license agreement on behalf of Scotts and OMS. Plaintiff's Exh. C at Scotts 0128. Such evidence, along with the fact that Scotts, undisputedly, assumed sole responsibility for policing of the Scotts trademark through its significant involvement in approving the specification for the design and manufacture of the lawnmower, and reviewing Murray's quality controls over manufacturing of the lawnmower, supports a finding that Scotts was the actual licensor to Murray of the Scotts trademark.

Similar evidence establish a material issue of fact as to whether OMS or Scotts was the actual licensor of the Scotts trademark under the OMS-Home Depot License

Agreement.  As noted, Scotts was the licensor in the 1996 License Agreement with
Home Depot for the Murray lawnmower, Plaintiff's Exh. C at 1, and that Scotts had the
right to conduct inspections of Home Depot's stores to assure that the Scotts
trademarked lawnmowers sold by Home Depot were of "higher quality."   OMS-Scotts
License Agreement, Section 8B, Defendant's Exh. A at 9.  Just as with Scotts's
inspection of Murray's production facilities, Facts, *supra*, at 8 n. 9,  Scotts does not
dispute that it, not OMS, exercised such quality assurance rights.

Accordingly, admissible evidence in this record supports a finding, after trial, that
Scotts has admitted it is the licensor of the lawnmower; alternatively, a material issue of
fact is presented as to whether Scotts or OMS, for the purposes of establishing
Plaintiff's claims in this action, should be considered as the actual licensor of the Scotts
trademark as placed on the Murray manufactured lawnmower at issue, and sold by
Home Depot, despite the terms of the OMS-Murray Manufacturing Permission
Agreement, and the OMS-Home Depot License Agreement, denominating OMS as the
exclusive licensor.  The court thus considers whether sufficient evidence exists to
establish whether Scotts's involvement in the design and manufacturing process for the
lawnmower was "significant," *Harrison, supra*, and "actual," *Porter, supra*, or whether
Scotts had the capability to exercise quality control over the manufacture of the
lawnmower sufficient to hold Scotts liable on Plaintiff's claims*, Harrison,* 603 N.Y.S.2d
at 826, beyond the bare fact of a licensor-licensee relationship, *In re: Celotex
Corporation,* 487 F.3d at 1338, thereby requiring that Scotts's request for summary
judgment be denied.

28

As discussed, Discussion, *supra*, at 18-19, applicable New York law recognizes that imposition of strict products liability upon a party that "ushers a product" to market, *Brumbaugh, supra*, at 708, is proper where the party can exercise leverage or control over its manufacturer to improve product safety through approval of the product's design applications, manufacturing quality controls and agreements requiring the party, such as a trademark licensor, to be indemnified by the manufacturer. *Sukljian*, 503 N.E.2d at 1360. Strict products liability is extended to retail-sellers as well, based on New York's policy that the retailers will similarly exert economic influence upon their manufacturers to provide safe products for public consumption thereby spreading the potential costs for compensation to injured parties for defective products across all participants in the chain of production and dispensing to consumers. *Sukljian*, *supra*, at 1360 (citing *Mead*, 394 N.Y.S.2d at 483). New York law also recognizes that regular suppliers of consumer products assumed a "special responsibility for public safety" and create "a forced reliance" on that assumption of responsibility "by purchasers of such goods." *Sukljian*, 503 N.E.2d at 1361. There is substantial evidence in this record upon which a reasonable juror could find that Scotts's involvement in the initial design and subsequent manufacturing process by Murray, including commencing manufacturing operations for the electric-start lawnmower at issue, was neither insignificant nor passive and was, as Scotts itself contends, consistent with Scott's obligations as a trademark licensor to protect its mark and trade-dress. Defendant's Memorandum at 9; Defendant's Reply Memorandum at 4. Further, it is undisputed that Scotts was the direct beneficiary of broad indemnification provided by Murray in the

29

event of strict products liability claims against Scotts arising from the sale and use of

the licensed lawnmower, and realized substantial financial royalty benefits from its

license of the trademark to Murray and Home Depot.

Contrary to Scotts's assertion that "neither OMS nor Scotts oversaw" or directed

the design process [for the lawnmower]," Defendant's Memorandum at 12, there is

evidence in the record from which a reasonable juror could infer and conclude

otherwise.  Particularly, Scotts's approved, with the assistance of an outside consultant,

the specifications for the lawnmower proposed by Home Depot and Murray.  Aronowitz

Deposition at 29; Plaintiff's Exh. C at Scotts 0035 (Memorandum of December 4, 1996

transmitting to a Scotts senior corporate executive "specifications" for "Scotts . . .

walking lawnmower . . . manufactured by Murray.").  In fact, recognizing its own lack of

internal expertise on establishing specifications for production of lawnmowers of

sufficient quality to carry the Scotts trademark, Aronowitz Deposition at 30-32, Scotts

contracted with a consultant to advise Scotts on whether the specifications, if

implemented, would result in production of a "quality" lawnmower.  *Id.*  While there is no

direct evidence that a similar specification approval process, including use of an outside

consultant, was employed for the electric-start model of the lawnmower, production of

which commenced in early 2001, there is circumstantial evidence that Scotts's quality-

control specialist assigned to Murray reviewed specifications or design features for the

electric-start model prior to commencing manufacturing of the new model of the Murray

lawnmower.  Plaintiff's Exh. C at Scotts 0111, 0116, 0121, 0126, 0137.  For example,

the internal Scotts quality-control report for December 2000 stated that "[i]ntroduction of

a new Murray electric-start walk-behind mower is under review by Melvin Smith.  Murray

has provided complaint data on a comparable basis.  Scott's [*sic*] production will not

start until Jan. 01 [2001]."  *Id.* at Scotts 0121 (underlining and bracketed material

added).  A reasonable juror could infer that, as with introduction of the 1996 push-

lawnmower, Scotts also approved the specifications for the safety features of the

lawnmower, including the design of the wiring system for the new electric-start model.

Because production of the lawnmower proceeded following Scotts's review, that

Scotts's personnel approved the specifications.  Evidence in the record also

demonstrates that Scotts consistently exercised quality control review to assure Murray

produced a lawnmower that conformed to those specifications.  Aronowitz Deposition at

31-32; 34; Plaintiff's Exh. D at Scotts 0151, 0158, 0166.

Scotts's quality control and review activities included frequent on-site visits by

Scotts quality control personnel to Murray's manufacturing facility calculated to assure

Murray's detailed compliance with the Scotts-approved specifications for the

lawnmower, Plaintiff's Exh. C at Scotts 0097; Plaintiff's Exh. D at Scotts 0151, 0158,

0166, as well as Scotts's review of customer complaints.  Plaintiff's Exh. C at Scotts,

0095, 0103, 0113, 0119, 0124, 0129, 0145; Plaintiff's Exh. D at Scotts 0155.  For

example, in an internal report, Scotts's quality control officials noted that a quality

control check of a Scott brand lawnmower revealed that "three of four blade torque

checks exceeded the upper limit specification" but that "no corrective action [was]

taken" (bracketed material added).  Scotts's quality control activity also included

sampling of the lawnmowers, Plaintiff's Exh. C at Scotts 0136-37; Plaintiff's Exh. D at

Scotts 0149; Aronowitz Deposition at 32-34, testing of the licensed lawnmower product

as produced by Murray, Aronowitz Deposition at 32, "auditing" of Murray's "quality

processes" to insure a quality lawnmower product was produced in conformity with the approved specifications, Aronowitz Deposition at 27-28; Plaintiff's Exh. D at Scotts 0156, and reviewing Murray's product safety testing record related to the lawnmowers. Aronowitz Deposition at 75-76.  Scotts's quality control visits to Murray's facilities were numerous (100 in 1999-2000) Plaintiff's Exh. C at Scotts 0097; Plaintiff's Exh. D at Scotts 0151, 0158 and 0166, and frequent, Plaintiff's Exh. C at Scotts 0136-37; Plaintiff's Exh. D at Scotts 1049, and sufficiently important to Scotts to warrant assigning a Scotts senior quality control staff member to monitor regularly Murray's manufacturing of the lawnmowers for purposes of quality.  Aronowitz Deposition at 85, 119-20.  To reinforce such quality control activity for the benefit of purchasers of the Scotts brand lawnmower product, Scotts maintained a toll-free customer complaint line, Plaintiff's Exh. F at Scotts 0217; Plaintiff's Exh. D at Scotts 0260.  Murray also maintained a customer complaint call center and used a Scotts "designed . . . internal complaint (computer) generated report."  Plaintiff's Exh. D at Scotts 0155.[17]  As a result of this customer communications facility, Scotts received numerous complaints from purchasers of the Scotts brand lawnmower manufactured by Murray, Plaintiff's Exh. D at Scotts 0184-0209, and responded to such complaints in Scotts's name.  *Id.* at Scotts 0187.  The jury will therefore consider, under New York law, whether (1) Scotts's approval of the specifications for the electric-start lawnmower demonstrates that Scotts "actually designed" the lawnmower, *Porter,* 600 N.Y.S.2d at 871, (2) Scotts's relationship to Murray's production process for the lawnmower, including monitoring of

---

[17]  The record is ambiguous as to whether such customer complaint systems were actually one system operated by Murray or Scotts.

quality controls, constituted "significant involvement in [its] distribution," *Harrison,* 603 N.Y.S.2d at 826, or (3) Scotts was "capable of exercising control over [the] quality" of the lawnmower sufficient to support Plaintiff's strict products liability and breach of warranty claims. *Id.*

In making this determination, the jury may also consider the significant linkage between manufacturing of a product and related quality control functions. The realities of manufacturing in the modern era have influenced courts to hold that "quality control is an integral part of the manufacturing process." *Jamesbury Corporation v. The United States*, 1980 WL 20818 at *13 (Ct. Cl. Feb. 7, 1980) ("There is no way to conceptually separate the two for no prudent manufacturer would market a product without some form of quality control."); *see also N.L.R.B. v. Lundy Packing Company*, 68 F.3d 1577, 1582-583 (4th Cir. 1995) (finding N.L.R.B. had improperly excluded quality control workers from manufacturing and production bargaining unit noting N.L.R.B.'s consistent prior findings that such quality control workers "perform a function which is an extension of and integrated with the manufacturing process." (quoting *Bennett Industries, Inc.,* 313 N.L.R.B. No. 254 (June 3, 1994))). New York courts have also recognized the importance of the quality control function to product manufacturing as relevant to the proper scope of strict products liability, and will extend strict products liability to a trademark licensor which, although "not <u>formally</u> involved as a manufacturer, designer or seller . . . [of] a defective product" is, notwithstanding, "<u>capable</u> of <u>exercising</u> <u>control</u> <u>over</u> [the] <u>quality</u> [of the product]." *Harrison,* 603 N.Y.S.2d at 826 (underlining and bracketed material added). Indeed, Scotts acknowledged the importance of such

quality control functions to the expected quality of its trademarked products like the

lawnmower at issue, and in maintaining the related strength of its trademark, produced

by third-parties, such as Murray.  Referring to the responsibilities of Scotts's quality

control department, in relation to Scotts brand products manufactured by such third-

parties, Mr. Aronowitz testified that "we'll [Scotts] insure that the [manufacturer's] quality

systems are in place . . . and at the end of the day, that the [Scotts brand] products

meet our [Scotts's] specifications."  Aronowitz Deposition at 25 (bracketed material and

underlining added).  Mr. Aronowitz further emphasized that Scotts's quality assurance

measures are calculated to "police" and protect its trademark.  *Id.* at 60.

Although no direct evidence in the record shows that Murray complied with any

particular quality control recommendations made by Scotts's quality control personnel,

based on their inspections and testing directed to the lawnmower model at issue, given

the extent and detailed nature of such quality control activity and resulting

recommendations, as demonstrated by this record, a reasonable juror could infer that

Scotts would not have undertaken such extensive quality control functions if it did not

expect Murray's full compliance particularly considering the importance Scotts assigned

to policing its trademark and the fact that Scotts enjoyed a right to terminate, with

OMS,[18] the OMS-Murray Manufacturing Permission Agreement based on a failure by

Murray to produce a "high quality" lawnmower worthy of the Scotts brand name.  OMS-

---

[18] Nothing in the record suggests OMS acted, or could have acted, independently of Scotts in enforcing OMS's right under the licensing agreements with Murray or Home Depot.  *See, e.g.,* Plaintiff's Exh. D at Scotts 0139 (Scotts internal memorandum detailing "on-site" visits to Home Depot stores in Atlanta by Scotts personnel); Plaintiff's Exh. C at Scotts 0045 (October 1, 1999 Letter from Mr. Aronowitz to Home Depot confirming that "Scotts," not OMS, had agreed to extend licensing agreements among OMS, Home Depot, John Deere, Scotts and Murray).

Murray Manufacturing Permission Agreement Sections 8A, 13A, Defendant's Exh. C at 5, 8.  For example, as early at 1999, even prior to execution of the 2000 OMS-Murray Manufacturing Permission Agreement covering production of the electric-start mower at issue, Scotts's "quality auditors" conducted specific "production line" testing of the lawnmowers including "measuring engine and blade torque, blade stopping time, walking the mower on a track, measurement of RPM's and wheel stability."  Plaintiff's Exh. D at Scotts 0149.  As further evidence of Scotts's overriding interest in quality control for the new lawnmower model, on November 7, 2000, Scotts directed that Murray provide "a quality review" for the new Murray electric-start lawnmower to be manufactured under the Scotts name, prior to commencing production of the new model along with a "complaint summary" on the current model.  Plaintiff's Exh. D at Scotts 0197.  Relevantly, in June 2004, Scotts issued a quality control protocol applicable to the Murray manufactured electric-start lawnmowers requiring that parts related to safety and performance issues be traceable to their source and date of manufacture, and that consumer complaints of any "defect that could lead to personal injury" be "reported immediately, to Scotts Quality Assurance" officials.  *Id.* at Scotts 0215 (underlining added).  A jury could conclude that, given Scotts's broad quality control and assurance authority over Murray, compliance by Murray with such specific directions was expected and forthcoming.

Taken as a whole, the record reasonably supports an inference that Scotts's detailed oversight of issues related to the quality of Murray's manufacturing process for the lawnmower, and its corresponding influence upon this process, was so extensive as to constitute actual control over such product quality matters, including the lawnmower's

35

defective wiring system at issue in this case.  This inference is bolstered by the
undisputed fact that Scotts operated a toll-free customer complaint telephone number
and received numerous complaints regarding the reliability of the lawnmower.  Plaintiff's
Exh. D at Scotts 0182-1097.  Thus, on this record, a reasonable juror could find that
Scotts had "significant involvement in," was "capable of exercising control over,"
*Harrison,* 603 N.Y.S.2d at 826, and in fact exercised such control over Murray's quality
control process applicable to the design and manufacture of the lawnmower at issue
and, further, that such quality control oversight was integral to, and thus intertwined
with, the design and manufacturing of the lawnmower sufficient to hold Scotts liable,
under New York strict products liability law, for the allegedly defectively designed or
manufactured lawnmower at issue in this case.

Scotts's particular reliance on *D'Onofrio, supra*, in support of summary judgment,
Defendant's Reply Memorandum at 5-6, is misplaced.  In *D'Onofrio*, the trademark
licensor, Spaulding, was found to have had insufficient control over the marketing of the
trademarked bicycle by Spaulding's licensee, Sears, which assembled and sold the
bicycle that caused plaintiff's injuries.  *D'Onofrio*, 635 N.Y.S.2d at 385.  Under its
license agreement with Sears, Spaulding had the authority to market "items and
materials bearing its name and the marketing plan" for such items.  *Id.*  In the instant
case, Scotts was granted similar written approval power over placement of the Scotts
trademark on the lawnmower and all related "advertising, promotional and display
material bearing" the Scotts trademark.  OMS-Murray Manufacturing Permission

Agreement, Section 9, Defendant's Exh. C at 6.[19]  Based on Spaulding's lack of control over either the marketing, manufacture or assembly of the allegedly defective bicycle, the court in *D'Onofrio* held the evidence insufficient to require trial on Plaintiff's strict products liability claim against Spaulding.  *Id.*

As such, *D'Onofrio* is plainly distinguishable from this record presenting, as it does, evidence of Scotts's substantially greater involvement in the design and key production aspects of the lawnmowers including, particularly, issues related to the quality of the lawnmower's performance and operation upon which Plaintiff's allegations of defective design and manufacture, relating to its wiring system, are based.  In the instant case, Scotts's authority, directly or through OMS, to terminate the manufacturing permission agreement based on Murray's breach of the OMS-Murray Manufacturing Permission Agreement, including Murray's warranty to OMS and Scotts that the lawnmowers would be "free of manufacturing and design defects" that could result in a poor quality lawnmower and legal claims, is another relevant fact distinguishing the present case from *D'Onofrio*.  *See* OMS-Murray Manufacturing Permission Agreement Section 8A, 13A, Defendant's Exh. C at 5, 8.  Thus, unlike *D'Onofrio*, in this action, despite Scotts' assertion to the contrary, Defendant's Reply Memorandum at 6, ample evidence demonstrates Scotts's active involvement in the design and manufacturing quality of the defective lawnmower, as well as its control over Murray's manufacturing process through the Scotts's power to terminate the agreement in the event of Murray's failure to produce non-defective high-quality products.  Given these distinguishing

---

[19]  An identical provision appears in the OMS-Home Depot License Agreement.  Defendant's Exh. A at 9.

factors, *D'Onofrio* does not support Scotts's request for summary judgment.

Another consideration, relevant under New York law, to whether Scotts, as a trademark licensor, may be held liable for Plaintiff's loss, under strict products liability is that the OMS-Murray Manufacturing Permission Agreement required Murray to defend, indemnify, and maintain insurance against "any claims arising from or related to" the manufactured lawnmowers based on strict products liability.  Defendant's Exh. C at 4. Specifically, the agreement specified that such indemnification and related insurance obligations, were equally applicable to both OMS and its "shareholders [*sic*]."  *Id.* (OMS-Murray Manufacturing Permission Agreement Section 7A).  As noted, it is undisputed that OMS is a wholly-owned subsidiary of Scotts.  Hence, as OMS's sole shareholder, Scotts directly benefitted from such defense indemnification and insurance against strict products liability claims, including the instant action, a fact admitted by Scotts. Specifically, at Mr. Aronowitz's deposition, in response to Plaintiff's question, "[t]he indemnification is provided by Murray to Scotts, is that right?"  Aronowitz answered, "That's right."  Aronowitz Deposition at 68-69 (referring to Defendant's Exh. C at 4).

As discussed, Discussion, *supra*, at 18, New York caselaw recognizes that such indemnification rights provide trademark licensors, as the indemnitees, leverage over their indemnitor-manufacturers to produce safer products, carrying the licensor's trademarks, for public consumption thereby justifying extending strict products liability to such licensors despite their more limited or indirect involvement in a product's manufacturing and distribution.  *See Sukljian*, 503 N.E.2d at 1360; *Brumbaugh*, 547 N.Y.S.2d at 701.  Thus, by virtue of Murray's undisputed indemnification obligation to

Scotts, Scotts could exert significant influence over Murray to avoid the design or manufacturing defects in the wiring system of the electric-start lawnmower which caused Plaintiff's loss in this case.  Exposing Scotts to strict products liability, on this record, is therefore consistent with the public policy considerations, recognized by New York courts in extending strict products liability to parties other than manufacturers which, like Scotts, as the trademark licensor of the lawnmower in this case, directly participated in "ushering," *Brumbaugh, supra*, at 701, a defective product – the lawnmower at issue –  into the stream of commerce.

In sum, the record provides a plethora of evidence, direct and circumstantial, from which a reasonable juror could determine that (1) Scotts, not OMS, was the actual licensor of the Scotts trademark under which the lawnmower at issue was manufactured by Murray and sold by Home Depot to Plaintiff's subrogors, (2) Scotts received and approved the specifications for the lawnmower, and conducted extensive quality control audits, including testing, based on sampling, of Murray's manufacturing process for the lawnmower, including a review of consumer complaints and related safety reports to the federal Consumer Product Protection Commission, (3) Scotts exercised fully, on a regular basis, extensive quality-control authority granted by the manufacturer, Murray, to oversee in fair detail Murray's compliance with design specifications reviewed and approved by Scotts for the lawnmower, specifically the electric-start lawnmower introduced in 2001 at issue, as well as the overall quality, including the safety of the lawnmower, in conformity with the specifications and Scotts's recommended quality assurance protocols, (4) Scotts extended to purchasers of the lawnmower a limited express warranty, (5) Scotts provided to purchasers a toll-free

telephone number to seek assistance in operation of the lawnmower and to lodge and

respond to complaints about the lawnmower's performance, and (6) Scotts received

substantial royalties based on the manufacture and sale of the licensed lawnmowers

sold by Home Depot.[20]   Based on such evidence, a reasonable juror could conclude

Scotts's active and "significant involvement" and "control over quality," *Harrison,* 603

N.Y.S.2d at 826, relating to the lawnmower's design and manufacture, sufficient to

render Scotts, as a trademark licensor under applicable New York law, liable under

Plaintiff's claims.   Significantly, Scotts cites to no New York caselaw barring strict

products liability claims against a trademark licensor based on similar facts, and the

court's research has revealed none.[21]   As such, material issues of fact going to Scotts's

_____

[20]   The fact that a trademark licensor receives substantial royalties based on sales of a
trademarked product produced and sold by third-parties has been held relevant by other leading state
court decisions on this issue.   *See Burkert v. Petrol Plus of Naugatuck, Inc.*, 579 A.2d 26, 29 (Conn. 1990)
(defendant licensor received no royalties or other financial benefits from the licensing program instituted
as a quality control measure to produce adequate supply of transmission oil for its customers, (relied on
by *Harrison,* 603 N.Y.S.2d at 826).   Here, although Scotts, through OMS, received no royalties under the
OMS-Murray Manufacturing Permission Agreement, Scotts does not contest that it received a minimum
annual royalty of $2 million pursuant to the 1996 Scotts-Home Depot License Agreement and the 2000
OMS-Home Depot License Agreement which granted Home Depot exclusive retailer status for all of the
Scotts brand lawnmowers manufactured by Murray.   Nothing in the records indicates the total amount of
royalties received by Scotts in connection with the sale of the Scotts brand lawnmowers prior to or after
the 2000 OMS-Murray Manufacturing Permission Agreement.   While no New York caselaw directly
considers receipt of substantial royalties as a factor to justify extending strict products liability to a
trademark licensor, based on the *Harrison* court's reliance on *Burkert, supra,* this court finds that if
presented with such facts, a New York court would find such receipt of such royalties relevant and
persuasive to hold a trademark licensor subject to a strict products liability claim.   Accordingly, the fact that
Scotts received substantial royalties in return for licensing its trademark to both Murray, as the
lawnmower's manufacturer, and to Home Depot, as exclusive retailer of the lawnmowers, should be
considered on the merits of Defendant's motion.   *Cf. Gebo v. Black Clawson Company,* 703 N.E.2d 1234,
1238 (N.Y. 1998) (absence of evidence that casual manufacturer "derived significant commercial <u>or
economic</u> <u>benefit</u>" from single bulk sale, insufficient basis, as a matter of law, upon which to impose
liability for ordinary negligence) (underlining added).

[21]   Although Scotts argues that Plaintiff's reliance, Plaintiff's Amended Memorandum at 6-7;
Plaintiff's Supplemental Memorandum at 5-6, on *Torres v. Goodyear Tire & Rubber Co.*, 786 P.2d 939,
944 (Ariz. 1990) and *Connelly v. Uniroyal, Inc.*, 389 N.E.2d 155, 163 (Ill. 1979), finding strict products
liability based on a licensor's involvement in the product's marketing "enterprise" is misplaced,
Defendant's Reply Memorandum at 3-4, Scotts's argument overlooks the fact that the court's opinion in
*Harrison, supra,* also relied on by Scotts, Defendant's Memorandum at 11, favorably cites to both *Torres*

liability on Plaintiff's Second Cause of Action, requiring trial, are presented on this

record, *In re: Celotex*, 487 F.3d at 1339 (trademark licensor's "degree of control" over

product quality issue on strict products liability under New York law is "a question of

fact." (citing *Harrison, supra*)).

      Similarly to Scotts's potential for liability under Plaintiff's strict products liability

claims based on its involvement in the lawnmower's manufacturing process, including

approval of the lawnmower's specifications and Scotts's significant quality assurance

activity, directed to the production of the lawnmower including introduction in 2001 of

the new electric-start model, Scotts may be liable to Plaintiff on its strict products liability

claim based on Scotts's active involvement and quality assurance activity in relation to

Home Depot's status as the lawnmower's exclusive retailer.  As with liability based on

the Scotts-Murray relationship under New York law, retailers with continuing relationship

to manufacturers, *Sukljian,* 503 N.E.2d at 1360, as well as the manufacturers, are

subject to strict liability claims based on injuries caused by defective products sold by a

retailer like Home Depot.  *Sukljian,* 503 N.E.2d at 1362; *Brumbaugh*, 547 N.Y.S.2d at

762.  As discussed, Discussion, *supra*, at 17-21, a trademark licensor may be subject to

---

and *Connelly.  See Harrison*, 603 N.Y.S.2d at 826 (relying on *Burkert v. Petrol Plus of Naugatuck, Inc., supra*), *Torres, supra, Connelly, supra,* and *Porter,* 600 N.Y.S.2d at 870-71).  In any event, it is not necessary to determine whether Scotts may be liable on strict products liability claims under the holdings in either *Torres* or *Connelly, i.e.,* that a trademark licensor is liable in strict products liability for damages from a defectively designed or manufactured product as "a significant participant in the enterprise" which brought the product to market where the licensor had the "ability to control the design, manufacture or quality of the [product]," *Torres*, 786 P.2d at 948; or, "as an integral part of the marketing enterprise," regardless of the extent of the licensor's involvement in the distribution of the product, based on the licensor's "participation in the profits reaped" from "placing a defective product in the stream of commerce," *Connelly*, 389 N.E.2d at 163, as the evidence, in the instant case record, is sufficient to support Scotts's liability, after trial, under the criteria, requiring conduct intended to promote product quality and the capacity to do so, beyond a bare licensing relationship, as stated in *Harrison, supra,* and *Porter, supra.*  Discussion, *supra*, at 17-39.

strict products liability claims where it has "significant involvement in [the] distribution or is capable of exercising control over [the] quality [of the product]," *Harrison,* 603 N.Y.S.2d at 826, or where evidence shows the licensor to have "sold, distributed, <u>or marketed</u>" the defective product, *Porter*, 600 N.Y.S.2d at 871 (underlining added), *see also D'Onofrio*, 635 N.Y.S.2d at 385 (evidence necessary to show licensor's "actual control" over "marketing plan" for defective product).   In the present record, several evidentiary elements establish material issues of fact as to whether Scotts's conduct as the trademark licensor of the subject lawnmower, in licensing Home Depot as its exclusive retailer, meets the applicable standard for strict products liability based on being an imputed seller, distributor or marketer under New York law.

First, in 2000 Scotts granted, through OMS, Home Depot the exclusive right to market and sell Murray manufactured lawnmowers under the Scotts trademark in a specified territory, the United States, Puerto Rico, Argentina, Canada, and Chili.  2000 OMS-Home Depot License Agreement Section 1 C, Defendant's Exh. A at 1-2.  In 1996 Scotts granted an identical license to Home Depot covering the United States market. 1996 Scotts-Home Depot License Agreement Section 1B, Plaintiff's Exh. C at Scotts 0003.  *See also* Aronowitz Deposition at 36.  Second, pursuant to Section 8A and 8B of the OMS-Home Depot License Agreement, Scotts was granted broad authority to inspect Home Depot's stores to assure itself that Home Depot's retailing of the Scotts brand lawnmower satisfied Scotts's quality requirements.  Defendant's Exh. A at 9. Third, it is undisputed that, pursuant to the authority, Scotts conducted extensive quality assurance inspections and audits at Home Depot stores.  Plaintiff's Exh. C at Scotts

0083, 0112; Scotts, 0139, 0144.  Fourth, Scotts collaborated with Home Depot in developing a "Scotts 'Home Depot' audits and quality manual," Plaintiff's Exh. C at Scotts 0040-0041, 0088, 0095.  Fifth, Scotts required Home Depot to regularly report sales of the lawnmower.  *Id.* at Scotts 0092, 0141.  Sixth, Scotts rigorously enforced its right to police its trade dress used by Home Depot in marketing the lawnmowers, demanding compliance by Home Depot, even prior to the 2000 OMS-Home Depot License Agreement.  Plaintiff's Exh. C at Scotts 0085, 0091.  Seventh, Scotts was to receive a substantial royalty from Home Depot based on Home Depot's sales of the lawnmowers with a minimum annual royalty of $2 million.  OMS-Home Depot License Agreement Section 2A (2) (a), Defendant's Exh. A at 3.  Eighth, under both its 1996 license agreement with Scotts and the 2000 license agreement with OMS, Home Depot was required to defend and indemnify Scotts against strict products liability claims. Defendant's Exh. A at 7; Plaintiff's Exh. C at 5.  Ninth, at an October 1999 Scotts-Home Depot meeting, conducted in Tampa, Florida, Scotts described its marketing and licensing relationship with Home Depot as a "partnership," Plaintiff's Exh. C at Scotts 0047, and advocated that pursuant to such "partnership" the two companies engage in a mutual marketing or promotional program for Scotts brand products, including "push mowers," calculated to capture market share for such products from competing Craftsman brand products, Plaintiff's Exh. C at Scotts 0049.

At the same time, Scotts offered to Home Depot licensing improvements and sales territory expansion as an inducement to Home Depot to enter into such a marketing "partnership."  *Id.* at Scotts 0061.  That Home Depot accepted this proposal is evidenced by the fact that Home Depot and Scotts, through OMS, extended their

43

exclusive marketing relationship for the lawnmowers in the 2000 OMS-Home Depot License Agreement, which expanded the marketing territory granted to Home Depot to include several foreign countries as Scotts had proposed at the Tampa meeting. *Compare* Plaintiff's Exh. C at Scotts 0003 with Defendant's Exh. A at 2.   The court finds that based on such evidence, a reasonable juror could infer that Scotts was substantially involved, if not actually engaged, not only as Home Depot's licensor but in fact, Home Depot's marketing and sales partner for the lawnmower, and, as such, that Scotts is subject, as a distributor and marketer of a defective product under applicable New York law, to Plaintiff's strict products liability claim.  *D'Onofrio,* 635 N.Y.S.2d at 385; *Harrison,* 603 N.Y.S.2d at 826; *Porter,* 600 N.Y.S.2d at 87-71.  Such uncontested involvement by Scotts evidences a degree of 'hands-on' collaboration with Home Depot that belies Scotts's assertion that it functions as a "mere trademark licensor." Defendant's Reply Memorandum at 6.  If the jury found such a marketing and sales partnership existed, under general principles of partnership law, Home Depot's actions as a retailer for the lawnmower would be imputed to Scotts.  *See Pederson v. Manitowoc Co.*, 255 N.E.2d 146, 150 (N.Y. 1969) (members of a partnership are jointly and severally liable for a tort committed in the course of the partnership business).[22]

Nor has Scotts cited any New York caselaw holding that Scotts's authority over and involvement in Murray's manufacturing quality control processes are an insufficient predicate for strict products liability because, as Scotts maintains, such activity was

---

[22]   Indeed, on this record, a reasonable juror could also find that Home Depot, Murray and Scotts operated a business enterprise, similar to a joint-venture, dominated by Scotts as the trademark licensor, for the design, manufacture, marketing and sale of the lawnmower.

intended primarily to protect Scotts's trademark or "trade dress."  Defendant's

Memorandum at 9, 11-12; Defendant's Reply Memorandum at 4.  Specifically, Scotts

contends that in satisfying its obligation as a trademark holder to protect the "quality

and value" of its registered trademark, Defendant's Memorandum at 11-12, Scotts

cannot be held liable for a strict products liability claim based on such conduct.  *Id.*

(citing *Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd.,* 817

F.Supp. 1103 (S.D.N.Y. 1993)).[23]  According to Scotts, New York law declines to

impose strict products liability based on a trademark licensor's "engag[ing] in oversight

of their trade dress in order to maintain its value and integrity."  *Id.* at 5.  Scotts's

contention is not only unsupported, it is unpersuasive.  Rather, because trademark

owners and licensors are obliged, under federal law, to "exercise some degree of

control over the use of the mark by the licensee, at the risk of abandonment of the

mark," *Hawaii-Pacific Apparel Group, Inc. v. Cleveland Browns Football Company LLC*,

418 F.Supp.2d 501, 506 (S.D.N.Y. 2006) (citing *Twentieth Century Fox Film Corp. v.*

*Marvel Enters., Inc.*, 277 F.3d 253, 259 (2d Cir. 2002)), Scotts's admission that its

quality promoting conduct, pursuant to its license relationship with Home Depot and

Murray, was taken in order to protect its trademark and trade dress constitutes

evidentiary support for a finding that Scotts's involvement in the approval of the

specifications and the quality control process relating to Murray's production of the

lawnmower, including Murray's introduction of the electric-start model in 2001, is a

---

[23]  As Scotts fails to explain how this case, in which the court found, *inter alia*, that plaintiff had abandoned the Brooklyn Dodgers trademark, is relevant to the issues presented on Defendant's motion, the court does not consider it further.

sufficient ground upon which to impose strict products liability under New York law.

It is well established that to avoid deceiving the public as to the quality of products produced under a licensed trademark, a "'word or symbol indicated the origin of a commercial product,'" *Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 97 (2d Cir. 1985) (quoting *Industrial Rayon Corp. v. Dutchess Underwear Corp*, 92 F.2d 33, 35 (2d Cir.), *cert. denied*, 303 U.S. 640 (1938)), a trademark licensor is required by the Lanham Act, 15 U.S.C. § 1114, *et seq.,* to "exercise[ ] supervision and control over the operations of its licensees" in order to avoid production of trademarked products of "diverse qualities." *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959). *See also General Motors Corporation v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986) (trademark licensors are required to "adequately" police a licensee's operations "to guarantee the quality of the products produced and sold under the mark." (citing *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F.Supp. 892, 917-18 (S.D.N.Y. 1968), *modified on other grounds*, 433 F.2d 68 (2d Cir. 1970), *cert. denied*, 403 U.S. 905 (1971))). As the court in *Gibson, supra*, stated, "a naked or uncontrolled license may provide a basis for an inference of an abandonment of a trademark, . . . a controlled licensing program will not." *Gibson,* 786 F.2d at 110 (citing *Carl Zeiss Stiftung*, *supra; Dawn Donut Co., supra*). Thus, where, as here, a trademark licensor, like Scotts, implements a quality control program over its licensee's production of the licensor's trademarked product to avoid any claims the licensor has abandoned the mark, it engages in a "controlled licensing program," *Gibson, supra*, and thereby closely associates itself with the process of producing or

distributing, i.e., "ushering," a product into the stream of commerce thereby exposing itself to strict products liability.  Brumbaugh, 547 N.Y.S.2d at 702.

Scotts's active and substantial efforts to "police" the Scotts trademark and trade dress,[24] as Scotts contends, beyond the existence of the licensing agreements with Home Depot and Murray, does not create a risk that strict products liability will be imposed on Scotts based on "nothing more than the fact that [Scotts] had a marketing idea or concept," Porter, 600 N.Y.S.2d at 871, or upon a "naked" license of the mark, Gibson, 786 F.2d at 110, "for use by another entity."  Porter, 600 N.Y.S.2d at 871.  In this case, the evidence shows Scotts was a licensor with far more than simply a "marketing idea or concept."  Taken to its logical conclusion, Scotts's argument would immunize from strict products liability any trademark licensor that approves design specifications for a  trademarked product manufactured by a third-party licensee, or oversees the licensee's manufacturing process, under a quality control assurance program intended to police the mark in order to avoid a finding of abandonment under federal trademark law.  Unsurprisingly, Scotts cites no authority in support of such a sweeping proposition, and relevant New York caselaw implicitly rejects it.  Discussion, supra, at 22-24.  Significantly, Scotts does not assert that the Lanham Act precludes strict products liability, based on state law, against licensors of registered trademarks.

---

[24]  Trade dress protects "the appearance of the product" inclusive of its "container."  L.& J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc., 79 F.3d 258, 262 (2d Cir. 1996) (internal citations omitted).  Contrary to Scotts's contention, MacDonald Reply Affirmation ¶ 22, the record contains no evidence that Scotts's quality control program for the Murray manufactured lawnmowers was directed to any issues of the lawnmower's trade dress.  However, the record does include evidence that Scotts sought to enforce its trade dress rights as to Home Depot, thus reinforcing Plaintiff's contention that Scotts may be held to strict products liability as a distributor or marketer of the defective lawnmower based on its license relationship to Home Depot as the lawnmower exclusive retailer.  See, e.g., Plaintiff's Exh. C at Scotts 0085, 0091.

While the trademark licensor's obligation to police its mark for purposes of

maintaining the quality of the trademarked product, or to avoid a claim of abandonment,

can be seen as in tension with the licensor's desire to avoid exposure to strict products

liability claims based on involvement in the licensee's manufacturing or distribution

activities, because the purchasers, particularly in the case of consumer products, like a

lawnmower, rely on the trademark as representing the product to be of good quality, a

primary reason for even creating and using a trademark, and given the public's interest

in product safety, it is not unfair to impose liability upon trademark licensors based on

such involvement and quality assurance activity.  The licensor is thus in no worse a

position than if it had retained exclusive control over the quality and safety of the

trademarked product by manufacturing and selling the product itself.  As the New York

Court of Appeals aptly observed "[t]he manufacturer unquestionably intends and

expects that the product will be purchased and used in reliance upon his express

assurance of its quality and, in fact, it is so purchased and used." *Codling* , 298 N.E.2d

at 627.

Here, Scotts purposively arranged to have the lawnmower manufactured and

sold solely under its trademark and, under its interlocking licensing agreements with

Home Depot and Murray, required its exclusive retailer, Home Depot, to sell the Scotts

brand lawnmowers manufactured by Murray, also licensed by Scotts.  Scotts also took

numerous actions to assure the quality of the lawnmower including reviews and

approval of its design using an outside consultant and its own technical staff, and

testing for the lawnmower by Scotts's quality assurance staff that failed to obviate the

safety problem responsible for Plaintiff's loss either as a matter of defective design or

manufacture.  In these circumstances, the argument by a trademark licensor, to avoid strict products liability because it also engaged in "policing" its trademark, to assure quality and sales, rings hollow.  Indeed, Scotts's oversight of Murray's quality control function for manufacture of the lawnmower was so extensive that Scotts replaced Murray as the issuer of a standard limited warranty for the lawnmower.  Trademark licensors cannot reasonably be heard to complain that as a result of actions taken to protect their marks they will be unfairly exposed to strict products liability claims. Rather, the law expects that as licensors who seek to capitalize on the perceived strength of the mark, they, along with their licensees, will take steps to "usher" only safe products to market.  The risk of claims arising from the sale and use of licensed products can be controlled by careful selection of licensees, monitoring of design and production, as well as indemnification and insurance, additional costs that will in turn be included in the price of the product, as New York law and public policy contemplates. *See Codling,* 298 N.E.2d at 628 ("Whatever the total cost, it will be borne by those in the system.").

Exposing the trademark licensor to strict products liability proportional to the degree it polices its mark through rigorous quality assurance policies, including oversight of product design, also prevents the licensor from becoming an economic 'free rider,' obtaining the benefits of consumer confidence in the mark, manifested by increased sales and associated royalties, while sidestepping potential strict products liability claims that may arise where compliance with such quality assurance policies prove imperfect.  As such, extending strict products liability to trademark licensors which attempt to protect the integrity of their marks through effective quality control programs

49

relating to product design and manufacture is consistent with one of the fundamental premises upon which the doctrine of strict products liability is based, *i.e.*, that participants in a defective product's manufacture and distribution process who benefit financially from its sale should be assigned the burden of responding to legal claims for losses caused by harmful products.  Here, Scotts expected to receive at least $2 million in royalties annually, and even more, based on sales of the lawnmowers by Home Depot.  OMS-Home Depot License Agreement, Section 2A, Defendant's Exh. A at 3. "'The major purpose of strict liability is to place the loss caused by defective products on those who create the risk and reap the profit by placing a defective product in the stream of commerce,'" regardless of a manufacturer's negligence.  *Connelly*, 389 N.E.2d at 163 (quoting *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.,* 338 N.E.2d 857, 860 (Ill. 1975)).

Subjecting Scotts to potential liability on Plaintiff's strict products liability claims predicated on its intimate marketing relationship with Home Depot is also consistent with the policies underlying strict products liability.  Indeed, given the interlocking licensing agreements among Scotts (and later through OMS), Home Depot and Murray, Home Depot, as the lawnmower's exclusive retailer, shared with Scotts leverage over Murray to produce safe products.  *See Sukljian,* 503 N.E.2d at 1360 (regular product sellers, with "continuing relationships with manufacturers . . . most often in a position to exert pressure [on manufacturer] for improved safety of products . . ..").  As the exclusive seller of the lawnmowers, Home Depot would, under established New York law, therefore be subject to Plaintiff's strict products liability claim, and thus exonerating

50

Scotts from such liability where it has equal, if not greater leverage over Murray, as the manufacturer of the lawnmower, to produce a safe product would be an "incongruous" result.[25]  *See* David J. Franklyn, TOWARD A COHERENT THEORY OF STRICT TORT LIABILITY FOR TRADEMARK LICENSORS, 72 S.Cal.L. Rev. 1, 51 n. 204 ("It would be incongruous to hold a defendant such as a retailer or distributor, liable for an injury caused by a defective product the quality of which was beyond his ability to control, and to exculpate a trademark licensor who has a legal obligation to directly control the nature and quality of the product during [the] manufacture." (quoting Mary Stanley Silverberg, Note, PRODUCTS LIABILITY: IMPOSING STRICT PRODUCTS LIABILITY ON THE TRADEMARK LICENSE, 5 Univ. Dayton L. Rev. 408, 423 (1980) (bracketed material in quotation)).

      B.     <u>Plaintiff's Negligence Claim</u>.

      As Plaintiff has sued Scotts (and Murray) based on negligence as well as claims of strict products liability and breach of warranty, the court turns to Defendant's motion as directed to Plaintiff's First Cause of Action alleging negligence.[26]  Specifically, in regard to this claim, Plaintiff alleges that both Scotts and Murray negligently "designed, manufactured, assembled, sold, distributed, inspected, serviced, and repaired the Zaroleses' lawnmower," Complaint ¶ 19, resulting in the Zaroleses' fire loss.  Complaint ¶ 25.  Under New York law, parties injured by defectively designed or manufactured products may sue manufacturers as well as certain sellers based on negligence, strict

---

[25]  The record does not reveal why Home Depot is not a party to this action.

[26]  While Plaintiff's First Cause of Action does not specify negligent design, manufacture or a failure to warn as Plaintiff's basis for its negligence claim, as New York law recognizes each form of negligence, *Liriano v. Hobart Corp.*, 700 N.E.2d 303, 305-206 (N.Y. 1998) (citing cases), the court's analysis covers all three.

products liability or breach of warranty. *Voss v. Black & Decker Mfg. Company,* 450 N.E.2d 204, 207 (N.Y. 1983) (citing and quoting *Victorson v. Bock Laundry Mach. Co.*, 335 N.E.2d 275, 277 (N.Y. 1975)); *O'Bara v. Piekos*, 555 N.Y.S.2d 939, 940 (4th Dep't. 1990) (citing *Heller v. U.S. Suzuki Motor Corp.,* 477 N.E.2d 434, 437 (N.Y. 1985) and *Voss,* 450 N.E.2d 204, 207)); *see also Sukljian v. Charles Ross & Son, Co, Inc.*, 503 N.E.2d 1358, 1360 (N.Y. 1986) (dismissing negligence claim against casual seller of defectively designed surplus equipment based on lack of duty to warn purchaser of latent defects unknown to seller). Although, as recognized by New York courts, the doctrine of strict products liability has greatly lessened an injured party's burden to establish fault against the manufacturer of a defectively designed or manufactured product, *Denny v. Ford Motor Company*, 662 N.E.2d 730, 735, 736 n.3 (N.Y. 1995), the injured party retains the option to sue both "immediate and remote parties" who have a duty in the design of a product which proves defective to use reasonable care in such design and who breaches that duty. *O'Bara*, 555 N.Y.S.2d at 941. "Strict products liability for design defect thus differs from a cause of action for a negligently designed product in that the plaintiff is not required to prove that the manufacturer acted unreasonably in designing the product. The focus shifts from the conduct of the manufacturer to whether the product, as designed, was not reasonably safe." *Voss,* 450 N.E.2d at 207. "Negligent design is distinguished from design defect based on the fact that strict liability imputes liability to the manufacturer not on the basis of the manufacturer's negligence but because the product is not reasonably safe as it was designed." 86 N.Y. Jur. 2d *Products Liability* § 62 2008 (underlining added). "Thus, claims for negligent design and strict liability based on design defect are not duplicative

. . .." *Id.* at 594.  *See also Rutherford v. Signode Corporation*, 783 N.Y.S.2d 735, 736 (4th Dep't 2004) (affirming summary judgment dismissing strict products liability and negligence claims based on defective design against manufacturer and repairer). Accordingly, under applicable New York law, Plaintiff may assert claims alleging both strict products liability and negligence, as well as breach of warranty, based on the defective or negligent design of the lawnmower which caused the fire loss in this case.

Although neither side addresses the issue of whether Scotts, as the trademark licensor of the lawnmower, may be held liable to Plaintiff based on negligence, because the matter is before the court for a report and recommendation on Defendant's motion and as Defendant's motion seeks dismissal of all of Plaintiff's claims, in the interest of completeness, the court considers whether the record presents admissible evidence demonstrating the existence of a material issue of fact upon which Scotts's liability for such negligence, under applicable principles of New York law, may be based sufficient to avoid summary judgment.  As noted, neither party cites to any New York caselaw holding that where, as here, a party involved in the design of a defective product causing injury is also the trademark licensor of the product, such party is exempted from liability based on negligent design of the defective product, and the court's research reveals none.  Accordingly, the court turns to the application of basic principles of New York's negligence law to evaluate the merits of Plaintiff's claim.

Under New York law, negligence may be found whether a plaintiff establishes that (1) the defendant owed a duty to the plaintiff to avoid the risk of harm created by the defendant's act or omission, (2) defendant breached such duty, (3) plaintiff suffered injury, and (4) such injury proximately resulted from defendant's breach of the duty.

*Atkins v. Glens Falls City School District*, 424 N.E.2d 531, 535 (N.Y. 1981); *Sukljian,*
503 N.E.2d at 1361 (duty determined by policy, not forseeability); *Pulka v. Edelman*,
358 N.E.2d 1019, 1020-21 (N.Y. 1976) (existence of duty turns on "'whether the
plaintiff's interests are entitled to legal protection against defendant's conduct'" (quoting
Prosser, Torts (4th ed.) § 53, p. 325)).  New York courts recognize that a trademark
licensor may be liable in tort, including negligence, where such licensor, in addition to
licensing its trademark to assure the successful marketing, distribution or sale of a
defective product, also designed the product.  *See D'Onofrio*, 635 N.Y.S.2d at 385.
("[T]rademark licensor cannot be held for injuries caused by a defective product bearing
its label where the licensor did not design . . . the allegedly defective item." (citing New
York cases) (underlining added)).  Thus, under New York law, if Scotts owed a legal
duty to the Zaroleses as purchasers of the defective lawnmower which Plaintiff alleges
was defectively designed causing Plaintiff's loss, Scotts may be found liable to Plaintiff
under principles of common law negligence.

Here, the record presents facts demonstrating Scotts owed a duty of care to
retail purchasers of the lawnmower.  Specifically, the record contains evidence that
Scotts reviewed and approved, with the aid of an outside expert consultant, the
specifications for the lawnmower, Aronowitz Deposition at 30-32, in 1996, Plaintiff's
Exh. C at Scotts 0035, and that, as a result, the lawnmower was produced in
accordance with the specifications by Murray.  Scotts also was actively involved in
reviewing, and presumably approving, the design and production, in late 2000 and early
2001, of the electric-start model of the type of lawnmower, purchased by the Zaroleses,
through its quality control representatives assigned to monitor Murray's production of

the lawnmower.  While the record is somewhat imprecise on this point, there is

evidence establishing that Scotts's quality control specialist did review "new Power

Equipment Protocols with Murray" in the fall of 2000 prior to introduction of the electric-

start model.  Plaintiff's Exh. C at Scotts 0116 (underlining added).  Particularly, by

December 2000, the introduction of the "new Murray electric-start . . . mower" was

"under review" by Scotts's representative, Plaintiff's Exh. C at Scotts 0121 (underlining

added), and the "[s]tart-up production" of the new electric-start model was monitored by

Scotts in January 2001.  *Id.* at Scotts 0126.  Scotts does not dispute that the record

provides expert evidence that the wiring system was defectively designed causing the

lawnmower to overheat and ignite because of a short-circuit in the electric-start system,

*i.e.*, "connector," "conductor," or "wiring harness."  Plaintiff's Exh. H at 4.  Specifically,

Plaintiff's consulting engineer confirmed that the fire in the Zaroleses' garage was

sparked by flames emanating from the top of the lawnmower, that the lawnmower's

wiring was defective and that such defect caused the lawnmower's starter system to

overheat and ignite the lawnmower itself.  Plaintiff's Exhibit G at Z00016 (fire

investigator's report); Plaintiff's Exhibit H at 3-4 (forensic engineering report).  A

reasonable juror could also find that the defect in the lawnmower wiring system was

sufficiently substantial to negate a prior contrary opinion by a fire investigator that the

cause of the fire was accidental, *i.e.*, the result of placing the lawnmower too close to

flammable material in the garage too soon after use and while the lawnmower was still

hot from cutting grass.  *Compare* Plaintiff's Exh. J at GAZ 000007 (town fire

investigator's report) with Plaintiff's Exh. I at 1, 5 (Plaintiff's forensic engineering report).

Thus, Plaintiff has presented evidence from which a reasonable juror could infer that

defective design or manufacture of the lawnmower caused Plaintiff's loss, and determination of the issue of cause therefore requires trial.

The record also establishes that, based on its license relationship with both Home Depot and Murray, Scotts had the opportunity and authority to review and approve the design of the lawnmower, Discussion, *supra*, at 26-34 (citing Aronowitz Deposition at 25-32, 75-76), and that Scotts exercised such authority by referring the specification of the lawnmower proposed by Home Depot and Murray to an outside expert for review.  Aronowitz Deposition at 29.  Scotts's economic control over the business and legal interrelationship among Scotts as trademark licensor, Home Depot as exclusive retailer, and Murray as the manufacturer of the faulty lawnmower is evidenced by the fact that neither the Scotts-Home Depot, the OMS-Home Depot License Agreements, nor the OMS-Murray Manufacturing Permission Agreement contain any provision authorizing Scotts to review and approve specifications for the electric-start model for the design and manufacture of the lawnmower, yet it is uncontested that Scotts nevertheless did so, both as to the original model of the lawnmower in 1996 and the electric-start model in 2001.  That Scotts ultimately approved the proposed specification for the electric-start model is reasonably inferrable from that fact that the lawnmower was subsequently produced by Murray under the OMS-Murray Manufacturing Permission Agreement upon which Scotts's right to review and approve the specification was predicated.

Additionally, it is undisputed that Scotts engaged in the active oversight and review of Murray's introduction of the new electric-start model of the lawnmower, first produced in January 2001, one of which was later purchased by the Zaroleses in April

2001.  Discussion, *supra*, at 29-30, 33.  Scotts admitted that because it lacked sufficient

expertise in formulating specifications for the lawnmower, it had the specifications,

proposed by Home Depot and Murray, reviewed by an outside consultant.  Aronowitz

Deposition at 29.  As discussed, Discussion, *supra*, at 30-33, Scotts, through its quality

control staff reviewed and maintained control over the introduction of the new electric-

start unit by Murray.  However, despite Scotts's admitted lack of expertise regarding the

proper design of lawnmowers, Scotts nevertheless permitted Murray to commence

production without submitting the design of the electric-start model, including the wiring

system, for such expert review as it did with the earlier model.  A reasonable juror could

infer that such failure constituted a unreasonable omission under these circumstances.

Moreover, a reasonable juror may properly infer that the short-circuit problem which,

according to Plaintiff's expert report, caused the lawnmower to ignite, could have been

reasonably avoided by proper design of the wiring system to prevent the risk of such a

short-circuit, as well as the related combustion of the unit by the heat generated from

the short-circuit.  Significantly, Scotts does not contest Plaintiff's assertion that the

wiring system was defective, or that the short-circuit caused the fire in the lawnmower

and, as a consequence, the extensive damage to the residence.

Thus, upon this record, a reasonable juror could conclude that Scotts was

sufficiently involved in the design and manufacture of the lawnmower to be found liable

to Plaintiff for negligent design or manufacture of the lawnmower, specifically, its wiring

system relating to the lawnmower's electric-start feature, and that Scotts acted

unreasonably in failing to have the design specifications for the lawnmower's electrical

system reviewed by an expert before approving production of the new model despite

lacking the technical expertise to do so.  The court therefore turns to the question of

whether Scotts, as the trademark licensor of the lawnmower, owed a duty of reasonable

care in the design or manufacture of the lawnmower to individual retail purchasers and

users of the lawnmower like the Zaroleses, Plaintiff's subrogor.

It cannot be gainsaid that purchasers of a popular consumer product such as a

gasoline-powered, electric-start lawnmower have a reasonable expectation that such a

product will not spontaneously burst into flame upon storage in a garage following

normal use in mowing one's lawn.[27]  This expectation is particularly reasonable in the

case of a lawnmower sold under the Scotts brand, an undeniably strong trademark

covering lawn and garden products.  The record reveals that in approving specifications

to the lawnmower, upon introduction in 1996, Scotts relied on its belief that consumer

confidence in its mark would overcome any potential consumer reluctance to purchase

a Scotts lawnmower product despite that product's objective deficiencies in quality as to

certain features compared to competitive models.  Plaintiff's Exh. C at Scotts 0036

(internal memorandum, dated December 4, 2006, between Scotts senior executives

expressing opinion that Scotts's quality brand would overcome potential customer

purchase reluctance because of deficient features compared to features of leading

competitor products).   Thus, the Zaroleses, Plaintiff's subrogors, as retail purchasers of

the lawnmower, were foreseeable plaintiffs, and it is not unreasonable to hold a

trademark licensor which substantially involves itself in the actual design and

manufacture of a consumer product to assure quality, including safety, and thus the

---

[27]  Although Scotts asserts as an affirmative defense, product "abuse" and "misuse," no specific
evidence or argument is presented by Scotts establishing such defense as a matter of law.  Answer ¶ 52
(Ninth Affirmative Defense).

integrity and value of its trademark, as did Scotts in this case, also assumes the duty to

act reasonably to avoid production and sale of a potentially hazardous product for use

by the consuming public.  *See Sukljian*, 503 N.E.2d at 1361-62 (manufacturers and

sellers which are "part of the regular commercial network for that product" are within

"orbit of <u>duty</u>" to avoid harm from latent defects in product because of "forced reliance"

on "special <u>duty</u>" of producers and "regular sellers" of products to assure product safety)

(underlining added).  Scotts's purposeful use of its trademark to induce large scale

purchases of the lawnmower, to generate substantial royalties, buttresses, as

demonstrated by this record, the imposition of the element of  duty to avoid foreseeable

harm required to support Plaintiff's negligence claim.

Moreover, in this case, Scotts, through its licensing agreements with Home

Depot and Murray, exercised authority and thus control over the design and production

of the allegedly defective lawnmower.  Discussion, *supra*, at 22-49.  Under New York

law, where a party has the ability to control another party whose conduct may entail

danger to others, such party is held to a legal duty to exercise reasonable care to

prevent such danger.  *See Pulka,* 358 N.E.2d at 1021-22 (citing examples and Fowler

V. Harper & Posey M. Kime, *The Duty to Control the Conduct of Another*, 43 Yale L.J.

886, 887-88 (1934)).  Such duty is fairly established where the controlled party has a

relationship with an injured person from which a legal duty to avoid negligence is

created.  *Id.* at 1021-22.  It is basic, and Scotts does not contest, that as the

manufacturer of the lawnmower, Murray had a duty, enforceable under principles of

negligence, to exercise due care with respect to the design and manufacture of the

lawnmower.  *Voss*, 450 N.E.2d at 207 ("plaintiff injured by allegedly defective product

may seek recovery against the manufacturer on the basis of . . . negligence . . ..").
Based on the record, the court finds that the lawnmower could not have been designed
or produced if Scotts, as trademark licensor, had not approved the design and
authorized, pursuant to its authority, the initial production in 1996 of the lawnmower as
well as such licensor under the OMS-Murray Manufacturing Permission Agreement, as
the 2001 electric-start model.  Accordingly, Scotts had a legal duty to control Murray in
the reasonable design and manufacture of a non-defective or safe electric-start
lawnmower and, based on the evidence in this case, a reasonable juror could find
Scotts breached that duty proximately resulting in Plaintiff's loss.  Therefore,
Defendant's motion directed to Plaintiff's negligence claim should be DENIED.

      C.     <u>Plaintiff's Warranty Claim</u>.

      Turning to Plaintiff's claims, the Fourth and Fifth Causes of Action, based,
respectively, on express and implied warranty, New York law also permits
consequential damages proximately caused by a seller's, or other responsible party's,
breach of warranty including, as relevant here, injury to property.  N.Y.U.C.C. § 2-
715(2)(b) (McKinney 2008); *Denny,* 662 N.E.2d at 734-36 (breach of implied warranty
of fitness supports claim against manufacturer of product which included defective
component in addition to, and independent of, strict products liability); *Lizza Industries,
Inc. v. Hodge & Hammond, Inc.*, 388 N.Y.S.2d 126, 126 (2d Dep't 1976) (extending
liability based on consequential damages resulting from breach of implied warranties for
fitness for use and merchantability attributed to manufacturer); *see also Barouh Eaton
Allen Corporation v. Cillco, Inc.,* 2008 WL 465493 *6 (E.D.N.Y. Feb. 15, 2008) (citing
N.Y. U.C.C. § 2-715(1)-(2) (McKinney's 2008)).  Moreover, similar to New York's

requirements for strict products liability, a party "outside of the manufacturing, selling or distribution chain, including a trademark licensor, cannot be held liable for breach of warranty" pertaining to a defective product. *Laurin Maritime AB v. Imperial Chemical Industries PLC*, 752 N.Y.S.2d 855, 855 (1st Dep't 2003) (citing *Passaretti v. Aurora Pump Co.,* 607 N.Y.S.2d 688 (2d Dep't 1994) (citing New York cases)); *Abato v. Millar Elevator Service Company*, 690 N.Y.S.2d 806, 807 (4th Dep't 1999) ("a party outside the manufacturing, selling or distributive chain.") (citing *Passaretti*, 607 N.Y.S.2d at 689). On this record, given the plethora of evidence of Scotts's authority over, and active involvement in, the design and manufacturing, including Murray's quality control process, of the lawnmower, Facts, *supra*, at 6-10, Discussion, *supra*, at 22-49, including Scotts review and approval of the specifications and extensive quality control activities relating to Murray's manufacturing process for the Scotts branded electric-start lawnmower, a material issue of fact arises whether Scotts, as trademark licensor, was within the manufacturing "chain," *Laurin, supra*, for the lawnmower sufficient to render it liable to Plaintiff based on a breach of Scotts's express or implied warranties that the lawnmower was safe for use.  Complaint ¶ ¶ 35, 40.

As noted, Scotts denied Plaintiff's allegation, in support of its Fourth Cause of Action, that Scotts breached any express warranty.  Complaint ¶ 35; Answer ¶ 35.  A plain reading of Scotts's express and limited warranty for the lawnmower, Plaintiff's Exh. F, demonstrates Scotts's express and limited warranty was in lieu of any other express or implied warranties.  Plaintiff's Exh. F at Scotts 0229.  Additionally, such express warranty was limited to the remedy of a repair and replacement of parts used in the lawnmower that became defective within three years of purchase. *Id*.  Plaintiff

points to no other evidence of any express warranties made by Scotts relevant to support Plaintiff's Fourth Cause of Action in this case.  Accordingly, even if a jury were to find Scotts was sufficiently within the chain of manufacturing of the lawnmower as a prerequisite for consequential damages under New York law  for breach of an express warranty, here, because all express warranties applicable to the lawnmower have been excluded by Scotts's limited express warranty, and Plaintiff's action was filed on August 4, 2004,[28] more than three years after the Zaroleses purchased the lawnmower on April 24, 2001 (and Plaintiff does not contend otherwise), Plaintiff's Fourth Cause of Action, alleging Scotts's breach of express warranty, fails as a matter of law.  While an exclusion of express or implied warranties may be void as unconscionable in the case of personal injuries, N.Y. U.C.C. § 2-719(3) (McKinney 2001); *see also Mazzuocola v. Thunderbird Products, Inc.*, 1995 WL 311397, at *3 (E.D.N.Y. May 16, 2995), no claim for personal injuries is present in the case at bar, nor does Plaintiff contend Scotts's exclusion was unconscionable.

Despite the exclusion of warranties clause in its limited express warranty, Plaintiff's Exh. F at Scotts 0229, for the purposes of this action Scotts has, nevertheless, unambiguously admitted it impliedly warranted the lawnmower was safe for its intended purpose and use by the purchaser.  Answer ¶ 40.  As Scotts has admitted in its answer an implied warranty of fitness was extended to Plaintiff, Plaintiff's implied warranty claim is therefore not subject to the three-year period provided in the limited express warranty clause.  Scotts does not present any argument to the contrary

---

[28]  Nothing it the record supports that either the Zaroleses or Plaintiff presented any earlier claim to Scotts.

and does not otherwise specifically address this issue in support of its request for summary judgment.  Thus, if the jury finds that Scotts, based on the lawnmower's alleged defective wiring system, breached Scotts implied warranty that the lawnmower purchased by the Zaroleses was, as Scotts has admitted, safe and thus fit for use as a lawnmower and that such breach proximately resulted in Plaintiff's damages, the jury could, on this record, hold Scotts liable based on Plaintiff's breach of implied warranty claim.  *See Denny,* 639 N.E. 2d at 736.  Accordingly, summary judgment cannot be granted on Plaintiff's Fifth Cause of Action.

**CONCLUSION**

Based on the foregoing, Defendant's motion (Doc. No. 22) directed to Plaintiff's First, Second, Third and Fifth Causes of Action should be DENIED; Defendant's motion as directed to Plaintiff Fourth Case of Action should be GRANTED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATE MAGISTRATE JUDGE

Dated: June 24, 2008
Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      June 24, 2008
            Buffalo, New York